352 A.2d 40

COMMONWEALTH of Pennsylvania

v.

John Harry BRUNO, Appellant.

Supreme Court of Pennsylvania.

Argued Jan. 17, 1975 (J–47).

Decided Jan. 29, 1976.

Daniel L. Quinlan, King of Prussia, for appellant.

Milton O. Moss, Dist. Atty., Stewart J. Greenleaf, Norristown, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Appellant John Harry Bruno was arrested on April 26, 1966, and charged with five murders. The trial court, pursuant to a Commonwealth petition, appointed a sanity commission, which, on June 12, 1967, declared appellant incompetent to stand trial. The trial court adopted the commission's findings, committed appellant, and dis-

missed appellant's writ of habeas corpus. This Court affirmed that dismissal on appeal. *Commonwealth v. Bruno,* 435 Pa. 200, 255 A.2d 519 (1969).

In November 1973 appellant was certified as competent to stand trial, and the Commonwealth proceeded on two of the five murder indictments. Appellant was found guilty on both counts of murder in the first degree in a jury trial on February 4, 1974, and was subsequently sentenced to two concurrent life terms.

In this appeal,[1] appellant raises three issues: (1) whether the Commonwealth met its burden of proving appellant sane beyond a reasonable doubt; (2) whether certain evidence should have been suppressed; and (3) whether the trial court committed reversible error by refusing either to sequester the jury or to conduct daily questioning of jurors to ensure that they had not been exposed to prejudicial publicity. We find appellant's third contention to be meritorious, reverse the judgments of sentence, and remand for a new trial.

## I—Sufficiency of the Evidence

Appellant's first argument concerns the sufficiency of the Commonwealth's evidence. Although he does not attack the sufficiency of the evidence linking him to the actual shootings, he claims that the Commonwealth failed to prove his sanity beyond a reasonable doubt.

Appellant offered expert testimony to the effect that he was insane at the time of the shooting. To sustain the conviction, therefore, the Commonwealth must show that the evidence is sufficient to support a finding of sanity beyond a reasonable doubt. *Commonwealth v. Demmitt,* 456 Pa. 475, 321 A.2d 627 (1974); see *Com-*

---

1. This direct appeal is brought pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1975).

*monwealth v. Rose,* 457 Pa. 380, 321 A.2d 880 (1974).[2] This burden may be met with either expert or lay witness testimony. *Commonwealth v. Demmitt,* supra; *Commonwealth v. Zlatovich,* 440 Pa. 388, 269 A.2d 469 (1970).

■ Appellant does not challenge the well-established definition for legal insanity in Pennsylvania—the M'Naghten test: a defendant is legally insane if, "at the time of the act, either he did not know the nature and quality of the act or he did not know that it was wrong." *Commonwealth v. Demmitt,* supra 456 Pa. at 481, 321 A. 2d at 631; see *Commonwealth v. Hamilton,* 459 Pa. 304, ——, 329 A.2d 212, 214 (1974), cert. denied, 420 U.S. 981, 95 S.Ct. 1411, 43 L.Ed.2d 663 (1975); *Commonwealth v. Woodhouse,* 401 Pa. 242, 249–50, 164 A.2d 98, 102–03 (1960); *Commonwealth v. Mosler,* 4 Pa. 264 (1846). Nor does he challenge the test for whether the evidence is sufficient to support a conviction:

> "[W]hether, viewing the evidence in the light most favorable to the Commonwealth and drawing all proper inferences favorable to the Commonwealth, the trier of fact could reasonably have found that all of the elements of the crime had been established beyond a reasonable doubt."

*Commonwealth v. Robson,* 461 Pa. 615, 625, 337 A.2d 573, 578 (1975); see *Commonwealth v. Boyd,* 461 Pa. 17, 334 A.2d 610 (1975); *Commonwealth v. Murray,* 460 Pa. 605, 334 A.2d 255 (1975). Thus, we must determine whether the evidence, viewed in the light most favorable to the Commonwealth, supports a finding beyond a rea-

---

**2.** The trial court incorrectly charged the jury that appellant had the burden of proving his insanity by the preponderance of the evidence. Appellant did not object. Because we find the evidence sufficient to sustain the conviction under either the *Demmitt* test, decided since appellant's trial, or prior law and because we must order a new trial on other grounds, we need not determine whether *Demmitt* applies to this case.

sonable doubt that appellant knew the nature and quality of the act and knew that it was wrong.

The following evidence was presented at trial: Ottavio and Pauline Perricone were killed by a .22 caliber revolver during the evening of April 23, 1966; a revenge note together with a list of names (including the deceased), both written in appellant's own hand, were found in his room; the murder weapon was found hidden in appellant's room; appellant's fingerprints and palm prints were found in the home of the victims; a cane with a thin blade at its tip was found with blood on the blade at the home of the victims, and appellant, when arrested, had a long thin scratch along the side of his face and neck; notes and writings were found in appellant's room from which it could be inferred that appellant believed that the persons on his revenge list were casting an "evil-eye" on his mother and, that, in order to break the spell, he had to "eliminate" them.

Appellant relies on the testimony by Doctors Bartle (the defense's expert witness) and Fisher (the Commonwealth's expert witness), who were both members of the 1967 sanity commission. Dr. Bartle testified that appellant had a long history of mental illness which began before the alleged murders and which required a finding of incompetency to stand trial in 1967.[3] Dr.

---

**3.** Appellant apparently believes that his history of mental illness and the sanity commission's finding of mental incompetency to stand trial require a finding that he is legally insane. He quotes the following testimony of Dr. Bartle, who read from the findings of the commission:

"Defendant is currently Schizophrenic, Paranoid, Chronic Association defect, Autistic, Affect defect, Apperception defect . . . . ."

The doctor also testified that these symptoms had probably persisted since adolescence.

This testimony does not necessitate a finding of legal insanity, however. The sanity commission report was not concerned with appellant's legal sanity but with his competency to stand trial. These have very different legal standards. Findings of mental illness, even of extreme proportions, do not necessarily mean that a defendant is legally insane. See *Commonwealth v. Hamilton*, 459

Fisher agreed; in response to a question by the court concerning appellant's ability to appreciate the nature and quality of his act, he also stated:

"I would presume that when he shot these people he knew he was killing them. Whether he was killing the people we think of as the people or whether he was killing a black witch, is something else."

■ The evidence also includes the following testimony by the two doctors: that appellant was aware he was killing the deceased by firing the revolver; that appellant could appreciate that the taking of life was wrong; that appellant's mental illness does not keep him from appreciating the nature of his act and that it was wrong; and, that, by hiding the murder weapon, it could reasonably be inferred that appellant knew that what he had done was wrong. If the jury had believed that appellant thought he was killing a black witch instead of a person, it would have had to conclude that appellant did not understand the nature and quality of his actions. However, this testimony, together with the circumstantial evidence linking appellant to the crime, was sufficient for the jury to conclude otherwise. There was evidence sufficient for the jury to determine beyond a reasonable doubt that appellant committed the murders and that he was legally sane when doing so.

## II—Admissibility of Evidence

Appellant's second argument is that the alleged murder weapon found in his room should be suppressed be-

Pa. 304, 306–312, 329 A.2d 212, 213–15 (1974), cert. denied, 420 U.S. 981, 95 S.Ct. 1411, 43 L.Ed.2d 663 (1975) ("the presence of a psychosis, albeit a severe mental disease, is not necessarily tantamount to 'insanity' under M'Naghten"); Commonwealth v. Thomas, 444 Pa. 436, 441–42, 282 A.2d 693, 696–97 (1971); Commonwealth v. Zlatovich, 440 Pa. 388, 392–93, 269 A.2d 469, 471 (1970); Commonwealth v. Woodhouse, 401 Pa. 242, 246–49, 164 A.2d 98, 101–03 (1960). Moreover, the psychiatrists themselves testified that appellant could meet the standard for legal sanity despite his mental disease.

cause it is either the fruit of an illegal interrogation or found pursuant to a search warrant issued without probable cause.

Appellant's arrest on April 26, 1966, was preceded by a police investigation of five similar homicides. All of the victims were elderly, were on friendly terms with each other prior to their deaths, and had been shot with small caliber weapons in the early evening. In no case was there evidence of forcible entry. An informant supplied police with two documents that appellant had given him. One was a list of seven names, including those of the five victims, and the other was a revenge note. The police also learned that, prior to the first shooting, a .22 caliber revolver was stolen from a store shortly after a man matching appellant's description had inquired about it. The informant told police that appellant's family had been on friendly terms with all the victims.

The police, relying on this information, applied for and received body warrants for appellant and his father and warrants to search their business and home addresses. They authorized a search for a .22 or .25 caliber pistol and papers and writings pertaining to the murders. The police found numerous incriminating items: writings concerning voodoo, occult and the "evil-eye"; papers containing the names of the victims; and photos of corpses. However, the alleged murder weapon was not found. Appellant does not challenge the legality of this first search.

The following day, the police applied for and received a second warrant to search appellant's room for a .22 caliber pistol. The gun, hidden beneath a dresser in the room, was found at the beginning of this second search.

Appellant first contends that the police learned the whereabouts of the gun from appellant during an illegal interrogation. However, he offered no direct testimony to support his argument.

The suppression court ruling against appellant was based on the following uncontradicted testimony: the second search was conducted because, based on the additional physical evidence found (including the incriminating scratch mark on appellant's face), police determined that a more thorough search of appellant's room was necessary; appellant's confession was made only after he was confronted with the murder weapon; and appellant gave the police no leads whatsoever concerning the whereabouts of the gun.

The United States Supreme Court, in *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L. Ed.2d 441 (1963) (quoting J. Maguire, Evidence of Guilt 221 (1959)), stated the following test to determine whether evidence is a fruit of illegality:

> " '[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come by exploitation of that illegality or instead by means sufficiently distinguishable to be purged on the primary taint.' "

See *Commonwealth v. Whitaker,* 461 Pa. 407, 413, 336 A.2d 603, 606 (1975); *Commonwealth v. Knowles,* 459 Pa. 70, 79, 327 A.2d 19, 23 (1974); *Commonwealth v. Cephas,* 447 Pa. 500, 506–07, 291 A.2d 106, 109 (1972). Further, "it is the exclusive province of the [suppression court] to pass upon the credibility of witnesses and the weight to be accorded their testimony." *Commonwealth v. Garvin,* 448 Pa. 258, 269, 293 A.2d 33, 39 (1972); see *Commonwealth v. Roson,* supra; *Commonwealth v. Boyd,* supra; *Commonwealth v. Murray,* supra. Here, according to the uncontradicted testimony of the Commonwealth's witnesses, appellant made no mention of the gun's whereabouts, and it was found wholly independent of the illegal interrogation. There is no basis for this Court to overrule the suppression court, which would require disbelief of those witnesses.

Alternatively, appellant argues that the second warrant was improperly issued. He claims that the probable cause showing to search his room for the gun was exhausted by the first search. We disagree.

Clearly, it would be unreasonable to allow the police to search the same premises repeatedly for the same contraband on only one showing of probable cause. Prior to each issuance of a warrant, the information presented to the magistrate must be sufficient to persuade a reasonable person that probable cause exists to conduct the search. See *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Commonwealth v. Jackson,* 461 Pa. 632, 337 A.2d 582, cert. denied, 423 U.S. 999, 96 S.Ct. 432, 46 L.Ed.2d 376 (1975); *Commonwealth v. D'Angelo,* 437 Pa. 331, 263 A.2d 441 (1970). Thus, if a prior search has occurred, the police must present sufficient additional information to the magistrate to support a probable cause showing that the contraband remains in or has recently been moved to the premises despite the previous search.

Here, the police gained additional physical evidence, which was presented to the magistrate. The first search was conducted in the entire house and was based on an assumption that either appellant or his father was hiding contraband. Moreover, that search was conducted during a single afternoon. These facts fully support the investigating officers' testimony that the first search of appellant's room had been cursory and insufficient, particularly since the gun was likely to be well hidden, and that a second, more thorough search was necessary.[4] In these circumstances, there was sufficient additional in-

4. These facts support an alternative theory that the first search had not been completed and the first warrant remained in effect. The record shows that the police specifically asked the magistrate whether the first warrant was still effective but that the magistrate felt that the better procedure would be to issue a second warrant.

formation to support the magistrate's finding of probable cause despite the previous search.

### III—Prejudicial Publicity

Appellant's third contention concerns the prejudicial publicity that occurred during his trial. Specifically, he alleges that the trial court did not take adequate precautions to ensure that the jury was not influenced by newspaper articles publicizing his suppressed confession.

 The trial took place in Norristown, Montgomery County from January 29 to February 4, 1974. Prior to trial, a confession by appellant was suppressed because appellant had not been given *Miranda* warnings. On January 28, the court refused appellant's petition for change of venue. The following day, immediately after the jury panel had been selected, the court denied appellant's oral motion for sequestration of the jury.[5] The court, instead, made a general charge to the members of the jury. Although the record does not disclose the exact instruction, the court referred to it later in the proceedings in these terms: that the jury not expose themselves to any publicity concerning the trial; that they consider only the evidence presented to them at trial; and that they report anything to the court which would affect their ability to continue as jurors.

On January 30, prior to the opening statements and out of the presence of the jury, appellant made the following motion:

"[I]n view of your Honor's refusal to sequester the jury, I respectfully request your Honor to once again ask them if they read anything about this case in last

**5.** Appellant challenges this refusal to sequester the jury. However, he made no showing of potential prejudice to the court to support his motion. Although sequestration would have avoided the error discussed infra, the court, at the time of this motion, did not abuse its discretion by refusing to sequester the jury without such a showing. See *Commonwealth v. Gooslin*, 439 Pa. 170, 266 A.2d 655 (1970).

night's papers or if they heard anything on the radio or television."

The court refused this request, stating:

"I will rely upon the jurors to initiate anything that they feel duty bound and conscience bound to report to me. Otherwise, I don't believe I am in error in assuming that they followed the mandate that I laid down to them yesterday."

During the noon recess, appellant presented to the court a front page news article from the Norristown Times Herald, dated January 30, headlined: "Bruno Trial Jury Seated, Alleged Confession Out" and moved for a mistrial.[6] The motion was denied without comment.

At the close of the day's proceeding the court gave the following cautionary instruction to the jury:

"Members of the jury, remember my admonition about discussing the case among yourselves or anyone else or exposing yourself to anything concerning this case.

"Read a good book tonight instead of reading the newspapers or watching television and listening to the radio. That's a suggestion. It's a suggestion of how to occupy yourselves, *not a suggestion as to what you should not do*. I will see you tomorrow morning." (Emphasis added.)

The following morning, appellant presented to the court in chambers four newspaper articles which had appeared in local newspapers since the trial had begun.

6. BRUNO TRIAL JURY SEATED, ALLEGED CONFESSION OUT
 A panel of 12 jurors and two alternates were seated in Montgomery County Court yesterday for the trial of John Harry Bruno, accused in the series of 'evil-eye' murders here almost eight years ago.
 The jury selection came after the court earlier in the day ruled that Bruno's alleged confession of 1966 could not be entered into evidence.

 . . . . .

 The remainder of the article concerned the history of the case and details of the voir dire examination.

These included: a Philadelphia Inquirer article, dated January 29, headlined: "Evil-Eye Confession May Be Quashed";[7] a front page article from the Today's Post (a Montgomery County publication), dated January 30, headlined: "Bruno Confession Won't Be Trial Evidence";[8] and a front page article from the Norristown Times Herald, dated January 29, headlined: "Bruno's Alleged Confession Center of Court Moves."[9] Ap-

7. The article appeared in Section C, page 1:
 "EVIL-EYE CONFESSION MAY BE QUASHED
 A decision made by a judge behind closed doors Monday may suppress a confession in the trial of accused Norristown evil-eye murderer John Harry Bruno.
 Montgomery County Judge Robert W. Honeyman refused to comment on whether he ruled to admit as evidence or suppress the confession that was widely publicized by county investigators when Bruno was arrested in April of 1966.

 . . . . . . . . .

 In pre-trial proceedings Monday, defense attorney Daniel L. Quinlan asked Judge Honeyman to suppress the confession on grounds that it had been obtained illegally.
 Citing the same grounds, he also urged the judge to rule out the admission of the alleged murder weapon, a gun, and blood samples which allegedly were obtained by police at the scene of one of the murders.

 . . . . . . . . . .."

8. "5 Men, 7 Women Chosen For Murder Trial Jury
 BRUNO CONFESSION WON'T BE TRIAL EVIDENCE
 A confession signed by John Harry Bruno in 1966 will not be used as evidence against him in the 'evil-eye' murder trial underway in Montgomery County Court, an informed source said Tuesday.

 . . . . . . . . . .

 THE SOURCE said Judge Robert Honeyman ruled out the use of the confession in a closed-door session with defense attorney Daniel L. Quinlan and assistant Dist. Atty. Albert C. Oehrle Jr.

 . . . . . . . . . .

 Widely publicized by county investigators, Bruno's confession claimed the murders in the nature of executions. He said the victims had put the 'mal occhio'—'evil eye'—on his mother.
 Quinlan, who represented Bruno after the Norristown man's arrest, claimed then that the confession was illegaly obtained. He said the suspect had not been informed he had the right to remain silent and to secure the services of a lawyer.

9. "BRUNO'S ALLEGED CONFESSION CENTER OF COURT MOVES
 Montgomery County Court Judge Robert W. Honeyman issued a ruling behind closed doors yesterday as to whether or

pellant also alleged that a local radio program had given extensive coverage to the trial proceedings.

Appellant renewed his request that the jury be questioned concerning any exposure to the prejudicial publicity, but his motion was again denied. At the close of the day's proceeding, the court gave the following admonition:

"Don't discuss the case among yourselves or with anyone else, members of the jury, and remember my admonition about exposing yourselves to anything you should not expose yourselves to in connection with this case."

On February 1, during the noon recess, appellant again requested that the jurors be questioned, and he offered two additional news articles to support his request.[10] The trial court again denied his request. At

> not the alleged confession of John Harry Bruno, accused in the Norristown 'evil eye' slayings of the 1960's, may be entered into evidence in Bruno's trial.
>
> Assistant Dist. Atty. Albert C. Oehrle, Jr. said after pretrial proceedings that instructions had been given not to discuss the case outside of the courtroom. He refused to disclose whether Bruno's statement, taken after his arrest on charges of shooting to death five elderly Norristown area residents would be admitted as evidence.
> . . . . . . . . . ."
>
> The fourth article was from the Philadelphia Inquirer, section C, page 1, January 30, 1974, and was headlined:
>
> " 'Evil-Eye' Jurors Quizzed on Occult."
>
> These articles clearly indicate that the order impounding the suppression hearing transcript, required by Pa.R.Crim.P. 323(g), was violated. That rule states in part:
>
> "The clerk of court shall impound the record and the nature and purpose of the hearing and the order disposing of the application shall not be disclosed by anyone to anyone except to the defendant and counsel for the parties. The record shall remain thus impounded unless the interests of justice require its disclosure."
>
> The court apparently made no attempt to determine who violated the order or the circumstances of the violation.

10. These included: an article from the Philadelphia Inquirer, dated February 1, 1974, and headlined: "Hypnotist Testifies on Bruno's 'Evil-Eye' List"; and an article from the Norristown Times Herald, dated January 31, 1974, and headlined: "Trooper Testifies 'Print Linked Bruno to Slayings.' " Neither article referred to the

the close of the day's proceeding, prior to recessing for the weekend, the court gave only an instruction similar to that given the day before.

At no time prior to the end of the trial on February 4, 1974, were the jurors questioned concerning their exposure to the publicity which occurred during the trial. The jury was not specifically instructed to refrain from looking at newspapers and listening to the radio and television. Instead, they were given a mere "suggestion" to read a book. They were told only once, before the publicity concerning appellant's confession was brought to the court's attention, that they should report any incident to the court that might affect their judgment. Despite repeated defense motions, the court made no meaningful attempt to ensure that the jury was not influenced by the suppressed, but widely publicized, confession.

 The procedure to be followed to ensure a fair trial in the face of prejudicial publicity is clearly within the sound discretion of the trial court. Because the choice of procedure involves the balancing of fundamental rights—the defendant's right to a fair trial before an impartial jury and the rights associated with a free press—this discretion must be exercised with care. See *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L. Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209, cert. denied, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973). The trial court has numerous alternative procedures available. Pa.R.Crim.P. 326 states:

"In a widely-publicized or sensational case, the Court, on motion of either party or on its own motion,

suppressed confession and were primarily factual accounts of evidence presented at trial. However, they did refer to evidence not presented at trial, including allegedly "inflammatory" and "grisly" slides of the deceased bodies. They also offer further indications of the extent of the publicity.

may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury, the seating and conduct in the courtroom of spectators and news media representatives, the management and sequestration of jurors and witnesses, and any other matters which the Court may deem appropriate for inclusion in such an order. In such cases it may be appropriate for the court to consult with representatives of the news media concerning the issuance of such a special order."

See also Pa.R.Crim.P. 313 (change of venue), 323(g) (impoundment of suppression court record), 1111 (sequestration of jurors); *Sheppard v. Maxwell*, supra 384 U.S. at 361–62, 86 S.Ct. at 1521–22; *Commonwealth v. Hoss*, 445 Pa. 98, 109 n. 7, 283 A.2d 58, 64–65 n. 7 (1971). (1971).

This Court has never had an occasion to determine the precise issue presented here, whether a trial court abuses its discretion by failing to question jurors concerning their exposure to a publicized, suppressed confession. However, our cases and the cases of the United States Supreme Court offer guidelines. As we stated in *Commonwealth v. Stewart*, 449 Pa. 50, 52, 295 A.2d 303, 304 (1972), cert. denied, 417 U.S. 949, 94 S.Ct. 3078, 41 L. Ed.2d 670 (1974):

"The minimal standards of constitutional due process guarantees to the criminally accused a fair trial by a panel of impartial and 'indifferent' jurors."

See *Irvin v. Dowd*, supra, 366 U.S. at 722, 81 S.Ct. at 1642.

Due process also requires that the jury consider only the evidence developed before it at trial. *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L. Ed.2d 424 (1965); *Irvin v. Dowd*, supra; *Commonwealth v. Pierce*, supra; *Commonwealth v. Stewart*, su-

pra. At the Supreme Court of the United States has observed, it may be more prejudicial for the jury to become aware of inadmissible evidence from outside sources than from an erroneous evidentiary ruling because of the absence of any procedural safeguards. See *Marshall v. United States,* 360 U.S. 310, 313, 79 S.Ct. 1171, 1172, 3 L.Ed.2d 1250 (1959); *Commonwealth v. Pierce,* supra 451 Pa. at 196–97 n. 3, 303 A.2d at 213 n. 3. Thus, if appellant had shown that the suppressed confession had in fact reached the jury, its highly prejudicial nature would necessitate a new trial.[11] Cf. *Commonwealth v. Harkins,* 459 Pa. 196, 328 A.2d 156 (1974).

■ The Commonwealth argues: (1) that the trial court's precautionary instructions offered sufficient protection against the jury inadvertently subjecting itself to the prejudicial publicity; and (2) that this Court should not assume that the jury failed to follow the court's order to report anything which would affect their judgment. However, the trial court's instructions were ambiguous. The court offered a mere suggestion rather than a directive that the jury not read newspapers, watch television, or listen to the radio. A juror might well have thought that a glance at a headline did not even violate the court's admonition. The court could easily have made its admonition more direct so that the jury

11. Jury consideration of an illegally obtained confession seriously jeopardizes a jury's impartiality because of of its highly prejudicial effect. See *Jackson v. Denno,* 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964); *Commonwealth v. Pierce,* 451 Pa. 190, 195, 303 A.2d 209, 212, cert. denied, 414 U.S. 878, 94 S. Ct. 164, 38 L.Ed.2d 124 (1973); *Commonwealth ex rel. Gaito v. Maroney,* 422 Pa. 171, 176–77, 220 A.2d 628, 630–31 (1966). An illegally obtained confession "operates as a kind of bombshell which shatters the defense." *People v. Schader,* 62 Cal.2d 716, 731, 44 Cal.Rptr. 193, 202, 401 P.2d 665, 674 (1965). Thus, we have held that the admission into evidence of a confession obtained in violation of a defendant's *Miranda* rights is reversible error. *Commonwealth v. Yount,* 435 Pa. 276, 256 A.2d 464 (1969), cert. denied, 397 U.S. 925, 90 S.Ct. 918, 25 L.Ed.2d 104 (1970); *Commonwealth v. Simala,* 434 Pa. 219, 252 A.2d 575 (1969).

would have understood its duty more clearly. See ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.5(e) (Tent. Draft, 1966) (hereinafter ABA Standards Relating to Fair Trial and Free Press).[12]

Moreover, even assuming that the instructions were unambiguous, there are certain situations when this Court has assumed that prejudicial material did reach the jury if strict precautionary measures were not taken. For example, in *Commonwealth v. Stewart*, supra, the trial court discovered that the father of the victim in a murder trial was on the panel of jurors from which the trial jury was selected. He was never called on voir dire and there was no evidence that he communicated with any members of the jury, although he had been seques-

---

12. Those standards recommend the following procedure:
"In any case that appears likely to be of significant public interest, an admonition in substantially the following form shall be given before the end of the first day if the jury is not sequestered.

'During the time you serve on this jury, there may appear in the newspapers or on radio or television reports concerning this case, and you may be tempted to read, listen to, or watch them. Please do *not* do so. Due process of law requires that the evidence to be considered by you in reaching your verdict meet certain standards—for example, a witness may testify about events he himself has seen or heard but not about matters of which he was told by others. Also, witnesses must be sworn to tell the truth and must be subject to cross-examination. News reports about the case are not subject to these standards, and if you read, listen to, or watch these reports, you may be exposed to misleading or inaccurate information which unduly favors one side and to which the other side is unable to respond. In fairness to both sides, therefore, it is essential that you comply with this instruction.'

"If the process of selecting a jury is a lengthy one, such an admonition shall also be given to each juror as he is selected. At the end of each subsequent day of the trial, and at other recess periods if the court deems necessary, an admonition in substantially the following form shall be given:

'For the reasons stated earlier in the trial, I must remind you not to read, listen to, or watch any news reports concerning this case while you are serving on this jury.' "

These proposed instructions would greatly reduce the risk of prejudicial publicity reaching the jury.

tered with them for two and one half days. All members of the jury had been asked on voir dire whether they knew anyone associated with the case, and all had answered in the negative. We held that prejudice should be presumed because of the "possibility" that an inherently prejudicial incident occurred during the sequestration. We quoted with approval Mr. Justice Black's observation in *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955):

> " '[O]ur system of law has always endeavored to prevent even the probability of unfairness.' "

*Commonwealth v. Stewart,* supra 449 Pa. at 57, 295 A.2d at 306.

In *Commonwealth v. Bobko,* 453 Pa. 475, 309 A.2d 576 (1973), the jurors had been given trial booklets which indicated that defendant had also been charged with crimes unrelated to those being prosecuted. There was no showing that the jurors had actually read the booklets, but the court made no effort to ensure that the jurors had not been prejudiced. This Court granted a new trial. See *Commonwealth v. Trapp,* 217 Pa.Super. 384, 272 A.2d 512 (1972); *Commonwealth v. McDaniel,* 217 Pa.Super. 20, 268 A.2d 237 (1970).

In *Commonwealth v. Pierce,* supra, highly prejudicial and inflammatory news articles concerning Pierce's alleged confession were published prior to trial. Although Pierce made no showing of identifiable prejudice, this Court held that the trial court, by refusing to grant a motion for change of venue, denied Pierce due process of law:

> "[T]he nature of the accounts released by the police were so 'inherently prejudicial' that Pierce need not have shown a nexus between the publicity and actual jury prejudice, and hence, he did not have the burden of showing identifiable prejudice."

Id. 451 Pa. at 195, 303 A.2d at 212.

■ Our cases also make clear that the trial court can avoid this presumption of prejudice by taking careful precautionary measures. For example, in *Commonwealth v. Dukes,* 460 Pa. 180, 331 A.2d 478 (1975), the jury was drawn from the same panel as the jury in a previous trial of the same defendant. The same situation occurred in *Commonwealth v. Free,* 214 Pa.Super. 492, 259 A.2d 195 (1969), and a new trial was ordered because of the possibility of prejudice. This Court, in *Dukes,* distinguished *Free* because "the trial court was meticulously careful to ascertain that no member of the jury was aware of the previous trial." Each juror was questioned in private, and an extensive voir dire examination was allowed. We held:

> "We are satisfied that the careful precautionary measures taken by the trial judge adequately served to insure the selection of a fair and impartial jury, one untainted by any knowledge that Dukes had been charged with another crime. There was thus no probability of any prejudice to appellant."

*Commonwealth v. Dukes,* supra at 185, 331 A.2d at 481. Similarly, to determine whether a trial court erred in refusing to grant a change of venue, the adequacy of the precautionary measures taken to minimize the effect of prejudicial publicity may be crucial. See *Commonwealth v. Hoss,* 445 Pa. 98, 106, 283 A.2d 58, 64 (1971); *Commonwealth v. Nahodil,* 462 Pa. 301, 306, 341 A.2d 91, 93–94 (1975).

■ When there is a possibility of highly prejudicial materials reaching the jury, the trial court must take appropriate protective action. Although the proper precautions are inevitably dictated by the circumstances of each case, they must reasonably ensure that no prejudice will occur.

■ Here, details of appellant's suppressed confession were the subject of highly prejudicial front page

news articles and news broadcasts. Even a random glance at a news rack would have been sufficient to convey the existence of the confession. The court gave an inadequate precautionary instruction to the jury and took no direct action to ensure that they were not exposed to such highly prejudicial information. In such circumstances, the trial court should have questioned each juror as appellant's counsel frequently requested to ensure that the publicity had not in fact reached the jury. The failure to do so denied appellant any chance to show actual prejudice. Such a procedure is required, upon the request of either party, under the ABA Standards Relating to Fair Trial and Free Press § 3.5(f):

> "If it is determined that material disseminated during the trial raises serious questions of possible prejudice, the court on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material. . . ."

Most United States circuit courts of appeals agree that special precautions beyond general, cautionary instructions must be taken in situations such as the one presented here and that failure to ensure the lack of prejudice is reversible error. *United States v. Hankish,* 502 F.2d 71 (4th Cir. 1974); *Silverthorne v. United States,* 400 F.2d 627 (9th Cir. 1968); *Mares v. United States,* 383 F.2d 805 (10th Cir. 1967); *Marson v. United States,* 203 F.2d 904 (6th Cir. 1963); see *United States ex rel. Doggett v. Yeager,* 472 F.2d 229 (3d Cir. 1973) (dicta, quoting ABA Standards); *Margoles v. United States,* 407 F.2d 727, 737 (7th Cir. 1969), cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969) (questioning jurors is a necessary and sufficient precaution); *Smith v. United States,* 236 F.2d 260, 269–70 (9th Cir. 1956) (questioning jurors is sufficient precaution).

The preferred procedure when highly prejudicial material is publicized during the trial and the jury is not sequestered is to question the jurors individually, out of

the presence of other jurors. See *United States v. Schrimsher*, 493 F.2d 848, 854 (5th Cir. 1974); *Mares v. United States*, 383 F.2d 805, 809 (10th Cir. 1967); *Margoles v. United States*, supra at 737; ABA Standards Relating to Fair Trial and Free Press §§ 3.5(e), (f) *(Commentary)*.[13] However, questioning jurors as a group or giving special precautionary instructions may be a sufficient precaution depending on the facts of the particular case. See e. g., *United States v. Schrimsher*, supra; *Margoles v. United States*, supra.

Here, because the trial court took none of these precautionary measures, there is a strong possibility that "inherently prejudicial" news articles publicizing appellant's suppressed confession reached the jury. Appellant, who repeatedly requested that the jury be questioned, was denied any opportunity to show actual prejudice. We must therefore reverse the judgments of sentence and remand for a new trial.

. Judgments of sentence reversed; case remanded for a new trial.

NIX, J., concurs in the result.

JONES, C. J., and POMEROY, J., dissent.

13. "Reported decisions indicate that jurors will often answer candidly when carefully questioned and when the atmosphere is not conducive to intimidation. It is important, however, that the method of separate questioning . . . be followed here and that the court not adopt a practice such as that employed in *Smith v. United States*, 236 F.2d 260, 269 (8th Cir. 1966) where the trial judge asked anyone who 'violated the instructions of the Court' to raise his hand. The necessity of separate questioning has been emphasized in several cases, notably in *United States v. Accardo*, where the appellate court stated:
'There is no certainty that the jurors would volunteer information about violating the admonitions or admit that they were influenced by the publicity. . . . [I]ndividual interviews would have tended to overcome reluctance to speak out.' [*Commonwealth v. Accardo*, 298 F.2d 133, 136 (7th Cir. 1962).]" ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.5(f) (Commentary).