J-A06031-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| SERGIO DROZ | |
| Appellant | No. 630 EDA 2014 |

Appeal from the Judgment of Sentence January 23, 2014
in the Court of Common Pleas of Chester County
Criminal Division at No(s): CP-15-CR-0000844-2013

BEFORE: PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.: **FILED MARCH 31, 2015**

Sergio Droz ("Appellant") appeals the judgment of sentence entered in the Chester County Court of Common Pleas following his jury trial conviction for felony murder,[1] robbery (inflict serious bodily injury),[2] robbery (threaten or intentionally put in fear of immediate serious bodily injury),[3] conspiracy to commit robbery,[4] possession of an instrument of crime ("PIC"),[5] firearms not

_____

[1] 18 Pa.C.S. § 2502(b).

[2] 18 Pa.C.S. § 3701(a)(1)(i).

[3] 18 Pa.C.S. § 3701(a)(1)(ii).

[4] 18 Pa.C.S. § 903(c).

[5] 18 Pa.C.S. § 907(a).

to be carried without a license,[6] and persons not to possess firearms.[7]  After careful review, we affirm.

The trial court summarized the underlying facts of this matter as follows:

> On February 4, 2013, [Appellant] was arrested in the City of Chester, Delaware County, Pennsylvania on the charges of [c]riminal [h]omicide and other related offenses under the Crimes Code.  After being transported by detectives from the City of Chester to the West Chester Police Department, [Appellant] was apprised of his **Miranda**[8] rights, which he voluntarily waived.  In the early morning hours of February 5, 2013, [Appellant] provided recorded interviews to police.
>
> On January 25, 2013, at approximately 10:50 p.m., Jamal Ahmed Scott suffered a fatal gun-shot wound to the heart while on the 200 [b]lock of East Union Street.  The 200 [b]lock of East Union Street is in West Chester Borough, Chester County, Pennsylvania, and encompasses 201 South Matlack Street.  The Apartments for Modern Living (colloquially referred to as the "Sidetrack Apartments") are located at 201 Matlack Street.
>
> On the night in question, [Appellant] (aka "Serge" or "Cool S") and four co-defendants traveled from the City of Chester to West Chester Borough for the purpose of robbing a drug dealer.  The five men discussed this plan to rob a drug dealer amongst themselves prior to arriving in West Chester.  The four co-defendants are as follows: Anthony Brightwell (aka "Tone" or "Skeez"), Calvin Thompson (aka "Crash"), Tyrone Palmer (aka "Millz"), and Nafis Janey.  Mr. Janey supplied the transportation to and from West Chester in the form of a white Nissan Maxima.  Mr. Thompson was responsible for assisting in locating the

---

[6] 18 Pa.C.S. § 6106(a)(1).

[7] 18 Pa.C.S. § 6105(a)(1).  The trial court found Appellant guilty of this charge pursuant to a stipulation.

[8] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602 (1966).

robbery victim and for facilitating the crime. Mr. Palmer is the registered owner of the Kel-Tec [.]9mm and Taurus [.]45caliber semiautomatic pistols used in the commission of the robbery and murder of Mr. Scott. Mr. Brightwell entered Mr. Scott's Honda Civic and discharged a single round from Mr. Palmer's .45 caliber into the vehicle's ceiling during the course of the robbery. Additionally, Mr. Brightwell removed Mr. Scott's backpack from the vehicle. Mr. Scott's backpack contained four sandwich baggies of marijuana. Upon hearing the .45 discharge, [Appellant,] armed with Mr. Palmer's .9mm, discharged three rounds into the driver's side window area of the Honda. Mr. Scott was fatally struck in the heart by one of the .9mm bullets fired by [Appellant].

Having briefly set out the relevant cast of characters and their roles as they relate to this case, we now review the pertinent facts of the underlying robbery and murder of Mr. Scott. After two unsuccessful attempts to locate a robbery victim, once near the Star Social Club, an establishment located on East Market Street in West Chester Borough, and once at the Giant supermarket just off Strasburg Road in East Bradford Township, the five men aborted the plan to rob a drug dealer and instead proceeded to Burger King located on West Chester Pike. However, the five of them were unable to purchase food from the Burger King because [Appellant's] debit card was declined. At this point, the group decided to drive back home to the City of Chester. While in [sic] route to the City of Chester, the men received a phone call about a potential robbery target. In response to this phone call, [Appellant and] [the] [co-]Defendants[] chose to turn around and head back to the Sidetrack Apartments. Once back at the Sidetrack Apartments, [Appellant,] armed with Mr. Palmer's Kel-Tec .9mm and Mr. Brightwell[,] armed with Mr. Palmer's Taurus .45 caliber[,] exited Mr. Janey's Maxima. [Appellant] positioned himself directly in front of apartment building "D" while Mr. Brightwell strategically waited across the street from building "D" for Mr. Scott to arrive. Mr. Janey, Mr. Palmer, and Mr. Thompson remained inside the vehicle and waited for [Appellant] and Mr. Brightwell to complete the robbery.

Mr. Scott arrived at the Sidetrack Apartments driving a silver Honda Civic registered to his girlfriend, Deanna Di'Domenico. Upon arriving at the Sidetrack Apartments, Mr. Scott called Mr. Brightwell. After making phone contact with Mr. Scott, Mr. Brightwell entered the front passenger door of the Honda. At

- 3 -

this point, Mr. Brightwell realized that he knew Mr. Scott from prior dealings. In fact, Mr. Scott had fronted Mr. Brightwell drugs in the past. Mr. Brightwell knew Mr. Scott by the nickname of "Mutters". Mr. Scott drove the Honda a short distance on East Union Street. The Honda came to an abrupt stop on the side of the road, across from building "E" of the Sidetrack Apartments. While inside the Honda, Mr. Brightwell pulled Mr. Palmer's .45 caliber pistol as a result of which a struggle ensued during which Mr. Brightwell discharged a single round from the firearm into the vehicle's ceiling. While this was happening, Mr. Brightwell grabbed the victim's backpack containing the marijuana and fled from the vehicle. Having heard the .45 caliber discharge, [Appellant] approached the driver's door area of the Honda. [Appellant] used Mr. Palmer's .9mm to tap on the driver's side window. [Appellant] told the victim not to move. Although Mr. Scott complied with [Appellant's] request and immediately put his hands up [in] the air, [Appellant] discharged three .9mm bullets at the driver side window/door area. One of these bullets struck Mr. Scott in the heart, fatally wounding him. Ballistic evidence confirmed that the bullet removed from the victim's heart was of the .9mm class and was consistent with being fired from a Kel-Tec .9mm semiautomatic pistol. After fatally shooting Mr. Scott, [Appellant] and Mr. Brigh[t]well called Mr. Palmer for a ride. [Appellant] and Mr. Brightwell were then picked up by Mr. Janey, Mr. Palmer, and Mr. Thompson whereupon the five men returned to the City of Chester and divided Mr. Scott's stolen marijuana amongst them.

1925(a) Opinion, pp. 2-3 (record citations and footnote omitted).

On November 18, 2013, a jury convicted Appellant as referenced *supra*. On January 23, 2014, the trial court sentenced Appellant to life imprisonment without parole on the felony murder conviction, 5 to 10 years' incarceration consecutive to the life sentence on the conspiracy conviction, and 4 to 8 years' incarceration consecutive to the conspiracy conviction on the persons not to possess firearms conviction. Additionally, the trial court sentenced Appellant to concurrent terms of 1 to 2 years' incarceration on the

PIC conviction, and a concurrent sentence of 3 to 6 years' incarceration for the firearms not to be carried without a license conviction. In total, Appellant received an aggregate sentence of life without parole followed by 9 to 18 years' incarceration.[9]

Appellant did not file post-sentence motions, but instead filed a timely notice of appeal on February 24, 2014.[10] Appellant and the trial court each complied with Pa.R.A.P. 1925.

Appellant raises the following two claims for review:

(1) Whether the trial court erred in denying [Appellant's] Omni-bus Pre-trial Motion for the Suppression of [Appellant's] videotape and recorded confession?

(2) Whether [Appellant's] Motion for a mistrial was improperly denied because several of the jurors admitted reading a newspaper during the trial that contained an article regarding the case.

Appellant's Brief, p. 7.

Appellant first claims that the police induced his confession by falsely promising that he would not be incarcerated for life if he confessed. *See* Appellant's Brief, p. 15. Specifically, he claims that the police convinced him that they had the authority to prevent him from being incarcerated for life

---

[9] The robbery convictions merged with the felony murder conviction for sentencing purposes.

[10] The 30th day following the imposition of sentence was February 22, 2014, a Saturday. Accordingly, Appellant had until the following business day, Monday, February 24, 2014, to timely file his Notice of Appeal. *See* Pa.R.A.P. 903, *comment*; Pa.R.A.P. 107; 1 Pa.C.S. § 1908.

and, that if he confessed, they would exercise that authority. ***See id.*** at 17.

Accordingly, he claims the trial court erred in denying his suppression

motion challenging the voluntariness of his confession to the police. He is

incorrect.

This Court's well-settled standard of review of a denial of a motion to

suppress evidence is as follows:

> [An appellate court's] standard of review in addressing a
> challenge to the denial of a suppression motion is limited to
> determining whether the suppression court's factual findings are
> supported by the record and whether the legal conclusions
> drawn from those facts are correct. Because the Commonwealth
> prevailed before the suppression court, we may consider only
> the evidence of the Commonwealth and so much of the evidence
> for the defense as remains uncontradicted when read in the
> context of the record as a whole. Where the suppression court's
> factual findings are supported by the record, [the appellate court
> is] bound by [those] findings and may reverse only if the court's
> legal conclusions are erroneous. Where . . . the appeal of the
> determination of the suppression court turns on allegations of
> legal error, the suppression court's legal conclusions are not
> binding on an appellate court, whose duty it is to determine if
> the suppression court properly applied the law to the facts.
> Thus, the conclusions of law of the courts below are subject to []
> plenary review.

***Commonwealth v. Jones***, 988 A.2d 649, 654 (Pa.2010) (internal citations

and quotation marks omitted).

> When a court is called upon to determine whether a confession is
> voluntary and, hence, admissible at trial, it examines the totality
> of the circumstances surrounding the confession to ascertain
> whether it is the product of an essentially free and unconstrained
> choice by its maker. In making this inquiry, a court is not
> concerned with the issue of whether the substance of the
> confession is true. Rather, a court is constrained to examine
> only whether an individual's confession was the product of

coercion, duress, or the use of other measures by interrogators deliberately calculated to overcome his or her free will.

***Commonwealth v. Smith***, 85 A.3d 530, 537-38 (Pa.Super.2014). "By the same token, the law does not require the coddling of those accused of crime. One . . . need not be protected against his own innate desire to unburden himself." ***Commonwealth v. Templin***, 795 A.2d 959, 966 (Pa.2002) (quoting ***Commonwealth v. Graham***, 182 A.2d 727, 730–31 (Pa.1962)).

> When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

***Commonwealth v. Harrell***, 65 A.3d 420, 434 (Pa.Super.2013), *appeal denied*, 101 A.3d 785 (Pa.2014) (quoting ***Commonwealth v. Nester***, 709 A.2d 879, 882 (Pa.1998)).

"The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily." ***Harrell***, 65 A.3d at 434. "The determination of whether a confession is voluntary is a conclusion of law and, as such, is subject to plenary review." ***Commonwealth v. Roberts***, 969 A.2d 594, 599 (Pa.Super.2009).

Here, the police interviewed Appellant over the course of approximately 4.5 hours from 1:30 a.m. to 6 a.m. on the morning of February 5, 2013. Contrary to Appellant's suggestion, this period was not simply one long "marathon interview." ***See*** Appellant's Brief, p. 15.

Instead, Appellant gave two separate statements during this time, with a lengthy break between the two during which Appellant took a car ride with police to show them where he had disposed of the murder weapon. Police did not handcuff, shackle, or otherwise restrain Appellant during the interviews, and their demeanor remained relaxed and non-threatening throughout. Appellant did not appear fatigued or under the influence of drugs or alcohol at any time during the interview process, but instead appeared awake, coherent, and aware of his surroundings. Police offered Appellant food and water throughout the process, and repeatedly explained that he could invoke his *Miranda* rights and stop the interviews at any time. Further, it is undisputed that police gave Appellant his *Miranda* rights during the first interview and again before the second interview, and that Appellant executed waivers of his rights on both occasions.

Appellant points to two exchanges that occurred during the interviews to support his argument that police coerced him to confess. The first exchange occurred as follows:

> Sergeant Louis DeShullo: And why you guys were there to begin with. Maybe – maybe it wasn't supposed to happen the way it happened. There's two types of people in this world. Listen. People that make bad choices meaning they make a mistake. They do something. They regret it. They're sorry for it. They wish it didn't happen.
>
> Appellant: Mm-hm.
>
> Sergeant Louis DeShullo: And then there's other people that are just pure evil. Meaning they did it, they could care less, and that's just the way they are. I know what type of a person I am.

At time in my life I have made bad choices. But overall I'm a decent person. What kind of person are you?

Commonwealth Exhibit 3, at 54.

The second portion of the interview of which Appellant complains occurred as follows:

Sergeant Louis DeShullo: You know how long life in prison is?

Appellant: The rest of your life.

Sergeant Louis DeShullo: How long is that?

Appellant: I don't know.

Sergeant Louis DeShullo: You don't know. It's hard for a 20 year-old person to understand that?

Appellant: Mm-hm.

Sergeant Louis DeShullo: This is your time and your opportunity to tell us exactly what happened and what you were thinking.

Commonwealth Exhibit 3, at 68.

The police made no promises to Appellant during these exchanges. They did not claim they were offering Appellant a sentence other than life imprisonment, and they did not guarantee that Appellant could get such a sentence by confessing. The trial court explained:

…Sergeant DeShullo merely asks [Appellant] if he fully comprehends the length of a life sentence. Even assuming that the question of voluntariness in this case involves some degree of psychological coercion, the totality of the circumstances do not evidence that detectives used deceptive or unethical conduct to over bear [Appellant's] free will. The detectives did not communicate to [Appellant] at any point during the interviews that they had the authority to enter into an agreement on the Commonwealth's behalf. Moreover, Sergeant DeShullo did not say or even imply that the Commonwealth would forego seeking

a life sentence in exchange for [Appellant's] confession. Moreover, [Appellant] acknowledged he was speaking to the detectives voluntarily and that he was not coerced, threatened, or promised anything in exchange for his confession. After considering the totality of the circumstances surrounding the initial statement of [Appellant] on February 5, 2013, and after viewing the videotape of that statement, the [c]ourt found the initial statement of [Appellant] and thereafter the second recorded statement, to be knowingly, voluntarily and intelligently made by [Appellant], and as such admissible at trial.

1925(a) Opinion, p. 6.

The record supports the suppression court's factual findings and its legal conclusions drawn from those facts are correct. Therefore, Appellant's suppression claim fails.

Next, Appellant claims the trial court erred by not granting his motion for a mistrial when one of the tipstaff discovered a local newspaper in the jury room. *See* Appellant's Brief, pp. 18-20. He is incorrect.

The standard of review regarding the denial of a motion for mistrial is abuse of discretion:

In criminal trials, the declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial. By nullifying the tainted process of the former trial and allowing a new trial to convene, declaration of a mistrial serves not only the defendant's interests but, equally important, the public's interest in fair trials designed to end in just judgments. Accordingly, the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, . . . assess the degree of any resulting prejudice. Our review of the resulting order is constrained to determining whether the court abused its discretion. Judicial discretion requires action in

conformity with [the] law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

*Commonwealth v. Culver*, 51 A.3d 866, 871 (Pa.Super.2012).

Pennsylvania's Rules of Criminal Procedure provide, in pertinent part:

When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion shall be made when the event is disclosed. Otherwise, the trial judge may declare a mistrial only for reasons of manifest necessity.

Pa.R.Crim.P. 605. "The remedy of a mistrial is an extreme one and should be invoked only where the ends of justice dictate." *Commonwealth v. Bolden*, 406 A.2d 333, 336 (Pa.1979). "A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Commonwealth v. Manley*, 985 A.2d 256, 268 (Pa.Super.2009) (internal quotations and citation omitted).

"The preferred procedure when highly prejudicial material is publicized during the trial and the jury is not sequestered is to question the jurors individually, out of the presence of other jurors." *Commonwealth v. Bruno*, 352 A.2d 40, 52 (Pa.1976). "However, questioning jurors as a group or giving special precautionary instructions may be a sufficient precaution depending on the facts of the particular case." *Id.*

Here, after jury selection, the trial court instructed the jury not to "read any newspapers or other stories about the trial or about the defendant." N.T. 11/12/2013, p. 12. Upon adjourning that day, the trial court reminded the jury not to talk to anyone about the matter, not to read any newspaper articles, and not to otherwise conduct any type of investigation into the case on their own. *See id.* at 33-34.

Despite the trial court's instructions and admonitions, the following morning, one of the jurors brought a local newspaper containing an article about Appellant's trial into the jury room. The court immediately stopped the trial when the tipstaff informed the court about the newspaper. The court informed the parties about the newspaper at sidebar and then addressed the jury. The following exchange occurred:

> **THE COURT:** . . . I think yesterday I asked everyone not to read the newspapers.
>
> Guess where I found this? In the jury room.
>
> Guess what the front page article is? About this trial.
>
> So let me ask you with a show of hands who read the newspaper this morning? Juror 2 and Juror 6.
>
> Who read the article about this trial? Nobody raised their hand.
>
> Juror 2, did you discuss any of the -- you did not read the newspaper article?
>
> **JUROR NO. 2:** That's correct. I saw the headline, I knew it was off limits so I passed by it, your Honor, went to the other parts of this paper.
>
> There's more to life than this courtroom.
>
> **THE COURT:** Juror No. 6, did you read the newspaper article?

**JUROR NO. 6:** No, I did not, your Honor. I read the sports section in the Philadelphia Inquirer.

**THE COURT:** You didn't read the Daily Local News?

**JUROR NO. 6:** Don't get that particular paper where I live.

**THE COURT:** Juror No. 2, did you bring the newspaper into the jury room?

**JUROR NO. 2:** Yes, I did.

**THE COURT:** Did you discuss any of the contents? Well, I guess if you said you didn't read any newspaper article, nothing about it?

**JUROR NO. 2:** I did not read the article.

N.T. 11/12/2013, pp. 23-24.

Following this exchange, defense counsel moved for a mistrial at sidebar. The trial court denied the motion, but still then asked all the jurors on the record whether they had read the Daily Local News that morning. *See* N.T. 11/12/2013, pp. 25-27. Aside from Juror No. 2, only Juror No. 11 had seen the Daily Local News that morning, and only to the extent that the juror had read that day's Sudoku puzzle. *See id.* at 27-32. Following this juror inquiry, the trial court dismissed Juror No. 2 from the jury. *See id.* at 32.

The trial court explained as follows:

Although the juror who viewed the article insisted that he could nevertheless decide the case fairly on the evidence that he would hear in the courtroom, the [c]ourt excused him from jury service. Juror No. 2 was replaced with an alternate juror. Satisfied the remaining members of the panel were not tainted by the article, the [c]ourt stated they were to draw no inferences from the fact that one of their members had been excused. They, in turn, assured the [c]ourt that they would hear the

evidence impartially. Finally, the [c]ourt reiterated that each juror was required to determine the facts of the case based upon the evidence and testimony heard during the course of the trial.

Potential juror exposure to this material may appear superficially to call into question the integrity of [Appellant's] trial. However, it is important to note that the jury had already been exposed to the majority of the article's content. With the exception of the statement regarding the two co-defendants' guilty pleas, the jury heard the remaining information during opening statements. Essentially, the article merely provided an accurate summary of the parties' opening statements. Given the totality of the circumstances, the [c]ourt properly replaced Juror No. 2 with an alternate juror and continued with the trial. After being in the best position to gauge jury prejudice, the [c]ourt was confident that [Appellant] would receive a constitutionally fair trial.

1925(a) Opinion, p. 8 (record citation omitted). The trial court's decision does not amount to an abuse of discretion.

Because the trial court did not abuse its discretion in denying the motion for a mistrial, Appellant's second claim also fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/31/2015

- 14 -