417 A.2d 128

COMMONWEALTH of Pennsylvania, Appellee,

v.

Clarence MILLER, Appellant.

Supreme Court of Pennsylvania.

Argued March 3, 1980.

Decided July 3, 1980.

Reargument Denied July 23, 1980.

460

Harry Stump, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Deputy Dist. Atty., Charles W. Johns, Kemal Alexander Mericli, Asst. Dist. Attys., Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

Appellant, Clarence Miller, was convicted of murder of the first degree after a jury trial in Allegheny County and sentenced to a term of life imprisonment. This is a direct appeal from the judgment of sentence.

Reading the record in the light most favorable to the Commonwealth, it discloses the following:

The victim, George Wilhelm, first met Miller in 1974. Miller and two associates, Orlosky and Goldblum, developed an elaborate scheme to defraud Wilhelm under the pretense of acquiring government land for him. In all, Wilhelm was defrauded of over twenty-one thousand dollars ($21,000.00). Wilhelm contacted the Federal Bureau of Investigation when he discovered the fraud, but Miller and Goldblum persuaded him to disclaim the complaint. Subsequently, Goldblum decided to set fire to a restaurant he owned in order to collect the insurance money so that he could satisfy a federal income tax debt. He offered Wilhelm three thousand dollars ($3,000.00) to commit the arson. Wilhelm set the fire but never received the full amount promised. Later, Goldblum expressed concern to Miller regarding Wilhelm's demands for payment and threats to inform law enforcement authorities of the arson.

Miller and Goldblum met in Pittsburgh on February 8, 1976 and agreed to silence Wilhelm by stabbing him. Miller agreed to lure Wilhelm to the site of the stabbing for a sum of fifty dollars ($50.00). On February 9, 1976, the three men met in downtown Pittsburgh. Goldblum told Wilhelm he had his money and requested Wilhelm to drive him and Miller to the roof level of a parking garage or, ostensibly, to Goldblum's automobile. When Wilhelm stopped his vehicle in the garage, Goldblum hit him over the head with a wrench causing him to slump out of the car. Goldblum began stabbing Wilhelm with a blade of a grass shear. The stabbing continued as Wilhelm, trying to recover, crawled around the floor of the garage. When he managed to pull himself up against the side wall, Goldblum struck him, and Wilhelm fell over the wall to the roof of a walkway to an adjoining building. Miller and Goldblum fled the scene. Wilhelm was discovered lying on the roof crying for help and died shortly thereafter from internal bleeding caused by the multiple stab wounds. Before death, Wilhelm told the police: "Clarence Miller did this to me."

During the police investigation that followed, Miller was taken into custody, and he implicated Goldblum. Thereafter, he cooperated with the police and testified as a Commonwealth witness at Goldblum's trial. Goldblum was convicted of murder of the first degree.

Prior to his own trial, Miller filed a motion to dismiss the charges against him. He alleged his cooperation with the police and his testimony at Goldblum's trial were induced by actions and statements on the part of the police and the district attorney's office which gave Miller and his trial counsel the impression that the prosecuting authorities had concluded Miller was not criminally responsible for the stabbing of Wilhelm, and this "impression" caused trial counsel to render less than effective assistance to Miller's prejudice and, thereby, denied him due process. After an evidentiary hearing, the trial court denied the motion to dismiss. This ruling is the first assignment of error.

The relevant facts follow:

Miller was taken into police custody on March 10, 1976. On that day, he made two statements to the police. The first was exculpatory, but, in the second, he stated Goldblum stabbed Wilhelm and he helped lure Wilhelm to the site fully aware of Goldblum's intentions.

Thereafter, Miller was hospitalized and visited by an attorney friend, Vincent C. Murovich, Esquire, who eventually became Miller's trial counsel. During the hospital visit, Miller told Murovich, Goldblum was guilty of the attack on Wilhelm and he, himself, was innocent of any wrongdoing. He did not tell the attorney that he had made two statements to the police and/or that he had told the police that he had helped lure Wilhelm to the scene of the attack knowing Goldblum planned to stab him. After hearing Miller assert Goldblum was alone involved in the stabbing, Murovich agreed to be Miller's counsel if Miller took a lie detector test and it established his innocence.

The lie detector test was administered, and police officer Amity told Murovich, Miller "flunked it." Murovich asked another officer, Condemni: "Is he telling the truth? Did this really happen?" Condemni responded: "No, he passed it, but it was shaky in some areas." Murovich did not inquire what questions were asked nor did he seek to know what areas were shaky. The police officers did not inform Murovich of Miller's self-incriminations when he was first arrested nor the specific results of the lie detector test, and Murovich first learned of Miller's inculpatory statements to the police shortly before or during the Goldblum trial.[1]

After the lie detector test was concluded and upon receiving the word that Miller had passed the test, under the circumstances outlined before, Murovich advised Miller to cooperate fully with the police.

1. In addition to Attorney Murovich, Miller was also represented at various stages of these proceedings by another attorney who learned of the two statements, as well as a third mentioned infra, prior to Goldblum's trial, but apparently failed to convey that information to Attorney Murovich until the Goldblum trial commenced or immediately before it commenced. For the purposes of this appeal, we accept the fact that Attorney Murovich was Miller's only counsel at trial.

Thereafter, Miller testified as a Commonwealth witness at the coroner's inquest at which both he and Goldblum were held for court on the murder charge. During his testimony at the inquest at the instance of an assistant district attorney, Miller refrained from giving any testimony concerning the motive for the Wilhelm attack.

Miller subsequently gave the police a third statement in which he said he helped lure Wilhelm to the garage so Goldblum could "beat him." After this statement, Miller was given another lie detector test focusing on his statement as to why Wilhelm was lured to the garage. After this test, Murovich was allegedly led to believe by an officer Freeman that Miller passed the test.

Specifically, Freeman told Murovich "he was 100 percent sure that [Miller] did not stab Wilhelm."[2] Murovich was aware of Officer Freeman's attempts to obtain bail for Miller in order for him to aid in the investigation. Miller gained bail and was again advised by Murovich to cooperate fully with the police.

Following the foregoing events and as the date for Goldblum's trial approached, Murovich, Miller, and assistant district attorney Dixon met and conferred on Miller's testimony at the trial. After about 15 minutes of discussion, Murovich prepared to leave saying: "You two seem to be getting along real well" and inquired: "Do you think you will be needing me?" Dixon replied: "No, not really, we'll be able to handle it with no problem."

Based on the foregoing, Miller contends he and his trial counsel reasonably believed the police and the district attorney's office "took the position that appellant did not have advance knowledge or intention to kill the victim and that he did not aid in the killing of the victim" and, acting on this belief and with the permission of his counsel, "he gave the Commonwealth evidence which it later turned against him."

**2.** A clergyman, Reverend Naumann, whom Freeman contacted to assist Miller in obtaining bail, testified that Freeman told him he believed Miller was innocent. Freeman testified that he represented only that Miller did not stab Wilhelm.

The problem with Miller's claim is that none of the alleged assurances or representations occurred as part of ongoing plea-bargain negotiations, nor was immunity from prosecution offered. Cf. *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (plea bargain); *Cooper v. United States*, 594 F.2d 12 (4th Cir. 1979) (plea bargain); *Commonwealth v. Zakrzewski*, 460 Pa. 528, 333 A.2d 898 (1975) (plea bargain); *Commonwealth v. Peters*, 473 Pa. 72, 373 A.2d 1055 (1977) (promise of immunity). Assuming arguendo the representations were made as asserted by Miller and his counsel, there was nothing binding about them; rather, they expressed what were essentially the opinions of the speakers that, *at most*, they believed, at certain points in time, Miller was innocent.[2a] Furthermore, in addition to the absence of any formal immunity offer, none of the representations even indicated Miller would not be prosecuted. Given the absence of representations made in a context of ongoing plea negotiations or a formal immunity offer and given the absence of any representations that Miller would not be prosecuted, counsel's representation cannot be said to have been rendered ineffective because of the representations here made. As stated, *at most*, the opinions of the speakers indicated a belief in Miller's innocence at certain points in time during the investigation, but, whether Miller and counsel misapprehended the Commonwealth's opinion about Miller's culpability or whether the Commonwealth changed its opinion of his culpability, those opinions under the circumstances presented could not have reasonably misled counsel into the course of action he took

**2a.** It is also urged that the opening statement of the assistant district attorney at the Goldblum trial also led Miller's counsel to believe the Commonwealth had concluded Miller did not have knowledge of Goldblum's intention to stab or kill Wilhelm when he joined Goldblum in luring Wilhelm to the garage. However, the record shows that, during the Goldblum trial, the evidence included Miller's statement to the police admitting he had prior knowledge of Goldblum's intentions to stab Wilhelm. Additionally, at the Goldblum trial, the jury was instructed it could find Goldblum was an accomplice of Miller in the homicide. Under the circumstances, it is difficult to understand how the Goldblum trial could have given Miller's counsel assurance that the Commonwealth believed Miller was free of responsibility in the killing.

even assuming such might be determined ineffective representation, an issue we do not reach. Accordingly, Miller was not denied due process for the reason advanced.

In this connection, Miller further alleges the Commonwealth, having advanced the theory during the Goldblum trial that Goldblum was the sole assailant and Miller was an onlooker, was estopped from prosecuting Miller. The Commonwealth advanced no theory and presented no evidence during the Goldblum trial which would *necessarily* preclude Miller's culpability. As noted before, the jury was charged it could find Goldblum guilty of murder of the first degree as a principal or as an accomplice of Miller.[3]

 Miller claims the trial court took insufficient measures to shield the jury from prejudicial publicity and erred in failing to declare a mistrial after the prosecuting attorney violated a court order barring communication with the press. While no court order appears of record, the Commonwealth concedes such an order was entered sometime prior to the Miller trial and further concedes the assistant district attorney did communicate with the press in violation of that order. The controversy revolves around a news article which appeared on the second page of the Pittsburgh Press on the evening of June 1, 1978, some eight days after the trial began. The article contained an account of that day's trial activities and included information that an inculpatory statement by Miller would not be admitted at trial by agreement of counsel because "it was taken after Miller had taken a lie detector test." The incriminating contents of the statement were reported, as well as an explanation the statement would be kept out of the trial "to avoid a legal

---

**3.** In a related claim, Miller challenges the sufficiency of the evidence to sustain his conviction. The alleged inconsistent Commonwealth theories are claimed to preclude a finding of guilt beyond a reasonable doubt. Since we have found nothing inherently inconsistent in the theories advanced by the Commonwealth, this claim must fail. An independent review of the record reveals sufficient evidence to sustain Miller's conviction of murder of the first degree.

issue." [4] While the assistant district attorney arguably violated our directive in *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209 (1973), regarding release of information to the news media by members of staffs of District Attorneys' offices, and concededly violated a protective court order, this standing alone does not require the grant of a new trial or other relief. See *Commonwealth v. Nahodil,* 462 Pa. 301, 341 A.2d 91 (1975). When there is a possibility highly prejudicial materials may reach a jury, the trial court is charged with responsibility to take appropriate protective action to ensure no prejudice will occur. The circumstances of each case determine what precautions are necessary. *Commonwealth v. Bruno,* 466 Pa. 245, 352 A.2d 40 (1976). In *Bruno,* in the face of extensive, inflammatory publicity, including information concerning a suppressed confession, the trial court did not specifically instruct the jury to refrain from looking at newspapers or listening to television and radio reports. The jury was warned but one time to report to the court any incident which might affect their judgment, and, despite repeated requests by defense counsel, the court totally refused to voir dire the jurors concerning possible exposure to prejudicial materials.

Instantly, we are concerned with the impact of one news article published during the course of the trial, not continued and pervasive inflammatory publicity. The article was located on page two of the newspaper where it could not be seen as the result of a casual glance. The article did contain the substance of a damaging admission by Miller which, while it had not been suppressed, had been excluded from the trial by agreement of Miller's counsel and the district attorney. While exposure of the jury to this material could have prejudiced fair consideration of the evidence before the jury, it is important to note the jury had already been

4. While most of the information in the article could have been collected during the course of the hearing on pre-trial motions, the report of the reason why the statement would not be admitted at trial is attributable to the prosecuting attorney. The statement contained an admission by Miller that he had held the victim during the stabbing.

exposed to the admission during the prosecutor's opening statement. At the time counsel agreed to exclude the statement from the trial, the jury was given a cautionary instruction not to consider the statement.[5] Under these circumstances, we conclude the trial court took sufficient precautions to protect the integrity of the trial.

On May 24, 1978, after the jury was selected, but before they were sworn, the court instructed the panel not to read newspaper reports connected with the case, not to listen to television, nor discuss the case with anyone. On May 25, 1978, after the jury was sworn, they were again warned not to discuss the case with anyone, even family members, not to read newspapers or other reports about the case or the defendant, and to avoid radio or television broadcasts which might refer to the case; the court stated: "Your only information about this case should come to you while you are present together, acting as a jury, in the presence of the Court and the attorneys and the defendant." Again, on May 26, 1978, the Friday before a long weekend, the court directed the jury:

"Members of the Jury, we have a long weekend coming up, all of you have a good time, but I want to admonish you again, don't let anybody talk to you about the case and don't read anything or listen to anything on television. . . ."

On June 2, 1978, defense counsel brought to the attention of the court the newspaper article under discussion. After refusing a defense motion for a mistrial, the court conducted individual voir dire of each juror and alternate, with a court reporter present,[6] and asked the following questions:

5. The cautionary instruction was as follows:
 "I want to call something to your attention. [The Assistant District Attorney] in his opening statement, made reference to a statement given by the defendant to Detective Stottlemyer, and because of certain reasons, which you have no concern with, that statement by agreement of counsel will be withdrawn from the case, from your consideration."

6. Both counsel and the defendant himself agreed to this procedure.

"Did you read the article in the Pittsburgh Press last night about this case?"

"Has anyone talked to you about the article that appeared in the Pittsburgh Press last night?"

Each juror and alternate responded in the negative to both questions, and the court was satisfied with the jurors' sincerity. At the end of the day, a Friday, the court refused a defense motion for sequestration of the jury [7] and instead issued an additional caution to the jury:

"Members of the Jury, I want to admonish you not to read newspapers or listen to the radio or television or read newspapers [sic] and I would also like to admonish you not to talk to anybody about this case and don't let anybody talk to you.

. . ."

On the next day of trial, the court refused defense counsel's motion for a repetition of the previous Friday's voir dire. In view of the prior exposure of the jury to Miller's statement, the minimal amount of publicity involved, the issuance of repeated warnings to the jury to avoid media reports about the trial and defendant, the jury's negative responses to individual voir dire, and the court's express judgment that the jurors were sincere and honest, we conclude the court satisfactorily shielded the trial from prejudicial publicity.[8]

 Miller asserts the admission into evidence of nine photographs illustrating the victim's wounds was reversible error. Although a photograph is generally admissible if it meets the criteria of relevancy and competency, we have developed a more demanding standard for photographs of

7. The decision whether to sequester a jury in the interests of justice is committed to the discretion of the trial court. Pa.R.Crim.P. 1111(a). See also Pa.R.Crim.P. 326.

8. We note the trial court substantially followed the procedures prescribed in the A.B.A. Standards Relating to the Administration of Criminal Justice, Standards Relating to Fair Trial and Free Press, § 3.6(e)(f) (App. Draft 1978). Our disposition of this issue in no way reflects approval of contact with the press by a member of a District Attorney's Office under protective court order not to so communicate.

corpses in homicide cases "to protect an accused from a conviction based upon a jury's emotional reaction, rather than a careful deliberation of the facts of the case." *Commonwealth v. Batty,* 482 Pa. 173, 177, 393 A.2d 435, 437 (1978). A two-stepped analysis is required. First, the court must decide whether a photograph is inflammatory in nature. "If, *but only if,* the photograph is deemed to be inflammatory, the Court must then apply the balancing test . . . i. e., is the photograph of 'such essential evidentiary value that [its] need clearly outweighs the likelihood of inflaming the minds and passions *of the jurors.*'" [Citations omitted.] [Emphasis in original.] *Batty,* supra, 482 Pa. at 177, 393 A.2d at 437. Instantly, the court determined the photographs were relevant and not inflammatory.

We have previously stated a photograph of a corpse is not inflammatory *per se. Commonwealth v. Petrakovich,* 459 Pa. 511, 329 A.2d 844 (1974). Rather, it is generally the manner in which a corpse is displayed which renders a photograph emotionally charged. The challenged photographs are black and white. They show portions of the victim's body with stab wounds, the majority of which are stitched closed. None shows a full view of the corpse, and only one depicts a small portion of the victim's face. The body has been cleared of blood and this makes the photographs appear overall quite clinical. Compare *Commonwealth v. Rogers,* 485 Pa. 132, 401 A.2d 329 (1979) (depiction in close and graphic detail of victim's distorted face, head wounds and blood, and flesh and brains scattered in snow around head); *Commonwealth v. Chacko,* 480 Pa. 504, 391 A.2d 999 (1978) (victim's body clothed in undergarments, body and clothing splattered with blood, and large, gaping wound in neck). Thus, admission of the photographs into evidence was not error.

Miller claims he is entitled to a new trial because a police officer testifying for the Commonwealth was permitted to give evidence regarding Miller's exercise of his Fifth Amendment right to remain silent and, thus, raised a prejudicial inference of guilt. See *Commonwealth v. Haideman,*

449 Pa. 367, 296 A.2d 765 (1972); *Commonwealth v. Mitchell,* 246 Pa.Super. 132, 369 A.2d 846 (1977). On the day of his arrest, Miller gave two statements to the police. After he finished the second statement, he was asked if he would tape it. Soon thereafter, he fainted. He did make the tape at a later date. It is the mention of his fainting which is now claimed to be prejudicial error. We cannot accept the proposition that fainting is an exercise of the Fifth Amendment right to stand mute in the face of accusation.

▮ Miller next asserts he was deprived of a fair trial when, on direct examination, a police officer referred to giving Miller a lie detector test. In *Commonwealth v. Johnson,* 441 Pa. 237, 272 A.2d 467 (1971), this Court held a reference to a lie detector test or its results which raises inferences regarding the guilt or innocence of a defendant is impermissible. Instantly the error allegedly resulted from the following exchange:

"Q. Mr. Miller was arraigned on February 11, 1976, that would have been a Wednesday. Did you participate in that?

A. Yes, Sir.

Q. Now, was there any questioning done in that procedure?

A. Not really. We were trying to make arrangements with his attorney to take a test."

This testimony did not identify the test, did not indicate whether it was ever arranged, and did not reveal any results. Miller's claim this testimony raised an impermissible inference of his guilt is without merit.

▮ Miller asserts the court should not have permitted evidence of the victim's dying declaration, "Clarence, Clarence Miller did this to me," because the victim's condition made him unable to distinguish between his observations and surmise.[9] It is true that to be admissible, a dying

---

**9.** The Commonwealth contends this claim is waived for failure of defense counsel to object specifically to the jury instructions before the jury retired to deliberate. However, defense counsel did submit a point for charge to the court which was rejected. See *Common-*

declaration must be based on observations of the declarant and may not merely be an expression of opinion based on reflection or reasoning. *Commonwealth v. Perry*, 364 Pa. 537, 73 A.2d 425 (1950). There was nothing in the circumstances of the instant dying declaration to lead to the conclusion it was an expression of opinion after reflection, rather than a first-hand observation.[10] Rather, the victim had just suffered serious wounds inflicted personally by an assailant or assailants. In all other respects, the statement met the requirements for admission of a dying declaration, i. e., at the time of the declaration, the declarant believed he would die, death was imminent, and death actually ensued. See *Commonwealth v. Brown*, 388 Pa. 613, 131 A.2d 367 (1957). The victim stated twice to police officers he knew he was going to die, and he did die shortly thereafter. Miller further argues the court was bound to instruct the jury to receive the evidence of a dying declaration with great caution. However, once the trial court has decided the declaration is admissible, a general charge to the jury on credibility of witnesses and weight of evidence, as was given in this case, is sufficient. *Commonwealth v. Edwards*, 431 Pa. 44, 244 A.2d 683 (1978).

Miller challenges the admission of allegedly inflammatory testimony by the victim's mother regarding the victim's physical incapacity following a work-related accident. The testimony was offered in rebuttal after defense testimony attempted to discredit the honesty of the victim by implying his claim of injury was merely a pretense used to receive a financial settlement. The admission or rejection of rebuttal evidence is within the sound discretion of the trial judge. *Commonwealth v. Farrior*, 446 Pa. 31, 284 A.2d 684 (1971). The trial court did not abuse its discretion in

wealth v. Young, 474 Pa. 96, 376 A.2d 990 (1977); *Commonwealth v. Williams*, 463 Pa. 370, 373 n. 1, 344 A.2d 877, 879 n. 1 (1975).

10. Cf. *Commonwealth v. Fugmann*, 330 Pa. 4, 198 A. 99 (1938) (Before dying of wounds caused by bomb received in the mail, declarant stated, "Fugmann done this." Since declarant had no personal knowledge of who sent the bomb, admission of declaration was error.)

admitting the challenged rebuttal evidence after finding it was not inflammatory.

■ Miller finally claims his two February 10, 1976 statements to police should have been suppressed because they were the fruits of an illegal arrest, i. e. a warrantless arrest in his home absent exigent circumstances and thus violative of our decision in *Commonwealth v. Williams*, 483 Pa. 293, 396 A.2d 1177 (1978). However, Miller's arrest occurred over two years before our holding in *Williams*, and we decline to accord the *Williams* decision retroactive effect.

" '[T]he Constitution neither prohibits nor requires retrospective effect' for decisions expounding new constitutional rules affecting criminal trials." (Citations omitted.) [11] *Desist v. United States*, 394 U.S. 244, 248–49, 89 S.Ct. 1030, 1033, 22 L.Ed.2d 248 (1969) (plurality opinion). In *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), a majority of the United States Supreme Court agreed on the factors which should inform a decision regarding retroactivity:

> "The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice." (Footnote omitted.)

*Id.*, at 297, 87 S.Ct. at 1970. The purpose to be served by the new rule should receive primary consideration. "Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect." *Williams v. United States*, 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388 (1971) (plurality opinion). Conversely, the same standard "strongly supports prospectivity for a decision am-

11. The question of retroactivity of *Williams* requires us to look to federal constitutional standards, as well as evaluating the problem in terms of our supervisory powers, because we based our holding in *Williams* on the Fourth Amendment.

plifying the evidentiary exclusionary rule," *Desist*, supra 394 U.S. at 249, 89 S.Ct. at 1033, the primary purpose of which is to deter unlawful police conduct.[12]

The remaining considerations, reliance of law enforcement authorities and burden on the administration of justice, also militate against retroactive application of our holding in *Williams*. Undoubtedly, Commonwealth law enforcement authorities justifiably relied upon prior practice which required no warrant to arrest a suspect in his or her home. We may take judicial notice of the adverse impact on the administration of justice in Pennsylvania which would result from requiring exclusion of the fruits of arrests legal at the time they were made.[13] Because our holding in *Williams* does not implicate the truth-determining process and because the governing criteria all run in favor of prospective application, we hold the *Williams* rule applies only to arrests made subsequent to the date of the decision, November 18, 1978.[14] See also *Commonwealth v. Cain*, 471 Pa. 140, 369 A.2d 1234 (1977) (opinion in support of affirmance; Eagen, J.); *Commonwealth v. Myles*, 471 Pa. 616, 370 A.2d 1193 (1977) (opinion in support of affirmance; Nix, J.).

Judgment of sentence affirmed.

ROBERTS, J., filed a dissenting opinion.

LARSEN, J., did not participate in the decision in this case.

12. Preservation of judicial integrity is an additional object of the exclusionary rule. Reception into evidence of the fruits of arrests legal at the time they were made does not violate this imperative.

13. If *Williams* were to apply to arrests made before the date of the decision, we would be faced with the further problem of whether to grant relief to those collaterally attacking their convictions. See *Commonwealth v. Heard*, 451 Pa. 125, 301 A.2d 870 (1973) (dissenting opinion; Pomeroy, J.).

14. Miller does not assert he was otherwise unlawfully arrested. There was probable cause sufficient to justify his arrest, the fruits of which are admissible against him.

474

ROBERTS, Justice, dissenting.

I dissent. The extrajudicial comment by the district attorney, in conceded violation of an order of the trial court, requires that judgment of sentence be vacated. Despite a specific court order enjoining discussion with the news media, and despite controlling decisions of this Court prohibiting such comment, see *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209 (1973), the district attorney in this case admittedly provided prejudicial information to the media during the course of appellant's trial. These wholly unnecessary comments promptly appeared during trial on page two of the local newspaper. Defense counsel's timely motion for sequestration was denied.

It is difficult to understand the function of court orders or our decisions if they can be willfully violated with impunity. The particular prohibitions applicable in this case are meant to provide assurance that time-consuming voir dire will not be required. Clearly, the usefulness of such requirements is lost if their direct violation can be thus ignored. Unlike the majority, I would vacate judgment of sentence and award a new trial.

I must also note the majority's erroneous, and in my view unnecessary, refusal to apply our decision in *Commonwealth v. Williams*, 483 Pa. 293, 396 A.2d 1177 (1978), cert. denied, 446 U.S. 912, 100 S.Ct. 1843, 64 L.Ed.2d 266 (1980), to this case. Appellant now claims as error the trial court's refusal to suppress a statement allegedly obtained as a result of appellant's arrest in his home, an arrest effected without an arrest warrant. In *Williams*, this Court held that absent exigent circumstances warrantless arrests in the home are unconstitutional, yet the majority now declines to apply *Williams* even in a case, such as this one, which was pending at the time of our decision in *Williams*, and which is now before us on direct appeal.

It should no longer be open to question that decisions of this Court, particularly those of constitutional import, must

be applied to all cases then pending on direct review. *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801); *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Commonwealth v. Chaney*, 465 Pa. 407, 350 A.2d 829 (1975); Note, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.J. 907, 912 (1962). Today's determination to the contrary violates fundamental notions of fairness, and arbitrarily and capriciously rewards the first defendant to place his case before the Court.

Moreover, the majority ignores *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), in which the United States Supreme Court held that the rule announced in *Williams* is mandated by the federal constitution. At the time of that decision the United States Supreme Court vacated and remanded those other cases then pending before the Court for reconsideration in light of *Payton*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Bush v. Florida*, 446 U.S. 902, 100 S.Ct. 1826, 64 L.Ed.2d 255 (1980); *Gordon v. New York*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 255 (1980); *Gayle v. New York*, 446 U.S. 905, 100 S.Ct. 1829, 64 L.Ed.2d 257 (1980); *Duragan v. Illinois*, 446 U.S. 905, 100 S.Ct. 1829, 64 L.Ed.2d 257 (1980). The Supreme Court's clear indication that *Payton* must be applied to all cases pending at the time of the Court's decision, is contrary to the view the majority adopts today.

Nevertheless, appellant does not dispute that the present search was supported by a valid search warrant for appellant's home. In such a circumstance *Williams* is of no aid. Thus, unlike the majority, I would reject this claim of error on the merits.