694 A.2d 1086

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Wayne A. SMITH, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 18, 1996.

Decided May 20, 1997.

66

68

Raymond Roger Williams, Media, William E. Ruane, Lansdowne, for W. Smith.

William H. Ryan, Robert A. Graci, Harrisburg, William R. Toal, III, Media, for Commonwealth.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

This is a direct appeal from judgment of sentence of death imposed on Appellant, Wayne A. Smith, by the Court of Common Pleas of Delaware County, Pennsylvania. For the reasons expressed in this opinion, we affirm Appellant's conviction and the judgment of sentence of death imposed on him.

Appellant was charged with murder and related offenses in connection with the killing of Eileen Jones. The jury found Appellant guilty of first degree murder.[1] After the penalty phase hearing, the jury concluded that the aggravating cir-

1. 18 Pa.C.S. § 2502(a).

cumstance it found (Appellant's prior conviction of voluntary manslaughter) [2] outweighed the mitigating circumstances it found (Appellant was suffering from mental or emotional disturbance at the time of the crime; [3] Appellant had some remorse; [4] and Appellant had an abusive childhood [5]). The jury returned a verdict of death. Judgment of sentence of death was imposed on Appellant on May 22, 1995.

Proceeding under new Pa.R.Crim.P. 1410 B(1)(c), Appellant elected not to file a post-sentence motion with the trial court.[6] His issues on appeal to this court are enumerated in his Statement of Matters Complained of on Appeal, and are addressed in an opinion issued by the trial court pursuant to Pa.R.App.P.1925(a).[7]

In all cases in which the death penalty is imposed, we must conduct an independent examination of the sufficiency of the evidence supporting the appellant's conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). "In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of the offense(s) beyond a reasonable doubt."

**2.** 42 Pa.C.S. § 9711(d)(12).

**3.** 42 Pa.C.S. § 9711(e)(2).

**4.** 42 Pa.C.S. § 9711(e)(8).

**5.** 42 Pa.C.S. § 9711(e)(8).

**6.** *See* Pa.R.Crim.P. 360 and 1410. Rule 1410, as it presently exists, was adopted in 1993, and is effective as to cases in which the determination of guilt occurred on or after January 1, 1994. Appellant herein was found guilty on May 19, 1995; thus, new Rule 1410 is effective as to him. New Rule 1410 B(1)(c) provides:

> c) Issues raised *before* or *during* trial shall be deemed preserved for appeal whether or not the defendant elects to file a post-sentence motion on those issues. (Emphasis added.)

As Appellant herein proceeded under this subsection, any issue raised before or during trial is deemed preserved for appeal.

**7.** 42 Pa.C.S. §§ 722(4), 9711(h).

*Commonwealth v. Hughes,* 536 Pa. 355, 361, 639 A.2d 763, 766 (1994).

▇ In a first degree murder[8] case, the Commonwealth must prove that the defendant acted with a specific intent to kill. 18 Pa.C.S. § 2502(d). The Commonwealth must show that: 1) a human being was unlawfully killed; 2) the defendant participated in the killing; and 3) the killing was done in an intentional, deliberate, and premeditated manner. *Commonwealth v. Mitchell,* 528 Pa. 546, 599 A.2d 624 (1991). It is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder. *Commonwealth v. Moore,* 473 Pa. 169, 373 A.2d 1101 (1977).

▇ The record reveals sufficient evidence upon which the jury could have found Appellant guilty of murder in the first degree. The evidence at trial was as follows. Ms. Jones had been at Don's Bar in Eddystone, Delaware County, with her boyfriend, John Murray, from approximately 6:00 p.m. until 8:30 p.m. on November 18, 1994. Upon leaving Don's Bar, the victim and John Murray visited with a friend, Helene Edwards, in the Sun Village area of Chester. Ms. Jones left Ms. Edwards' home, and, when Mr. Murray attempted to accompany her, she told him she was going to a friend's house. Mr. Murray last saw the victim at approximately 9:00 p.m. on November 18, 1994, walking alone up Morton Avenue.

At approximately 10:30 p.m. on that same evening, Ms. Jones was accompanied by an African–American male when she arrived at the home of her friend, Edna Love. The man who accompanied Ms. Jones wore stereo headphones and a

---

**8.** Section 2502 of the Crimes Code, 18 Pa.C.S. § 2502, provides in pertinent part:

**§ 2502. Murder.**

(a) **Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

. . .

(d) **Definitions.**—As used in this section the following phrases shall have the meanings given to them in this subsection:

"**Intentional killing.**" Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

baseball cap. Ms. Love did not invite Ms. Jones and her companion inside her home because Ms. Love was putting her baby to bed. Ms. Jones and her male companion left Ms. Love's house after a few minutes.

Appellant approached his nephew, Michael Smith, at approximately 11:00 p.m. on November 18, 1994, asking permission to use Michael Smith's car to take a woman to a motel. Michael Smith observed the woman at the time this request was made and later identified the woman who accompanied the Appellant as Ms. Jones. Appellant did not appear to Michael Smith to be intoxicated or "high" on drugs at the time he lent Appellant his car. Appellant later returned the car keys to Michael Smith at approximately 12:30 a.m. on November 19, 1994. On the afternoon of November 19, 1994, Appellant stated to his brother, Jeffrey Smith, that he had murdered Ms. Jones in Sun Village Park by choking her with his hands and with a belt.

The partially clothed body of Ms. Jones was discovered in Ridley Creek, in an area near the boundary between the City of Chester and the Borough of Eddystone in Delaware County, at approximately 10:00 a.m. on November 22, 1994. The Delaware County Medical Examiner determined that the cause of death was strangulation and that the manner of death was homicide.

Subsequently, in Appellant's bedroom, police recovered headphones, a baseball cap, and several newpapers from which articles regarding the recovery of the victim's body had been removed. While in police custody, Appellant was advised of his *Miranda* rights, which he waived. Appellant then provided detectives with a tape-recorded statement, which was transcribed and admitted into evidence at trial. In this statement, Appellant stated that he had borrowed his nephew's car so that he could buy drugs, and that the victim had agreed to have sex with him in exchange for drugs. Appellant stated that he and the victim had gone to Sun Village Park. When Appellant attempted to have sex with the victim on the ground, he became concerned that she would accuse him of

having raped her. Appellant then choked the victim to death, disposing of her body and her possessions in Ridley Creek.

After reviewing the record in this matter, we find that the evidence was more than sufficient for the jury to conclude that Appellant had the specific intent to kill Ms. Jones and that Appellant committed first degree murder. From the evidence, the jury could have concluded that: Ms. Jones was unlawfully killed; Appellant did the killing; and Appellant killed Ms. Jones in an intentional, deliberate, and premeditated manner.

█ Appellant's first argument is that the trial judge erred in refusing to permit Appellant to present the testimony of Dr. George Woody, either in his case-in-chief or on surrebuttal.

At trial, the defense intended to call two expert witnesses, Dr. George Woody and Dr. Perry Berman, who are both licensed psychiatrists, to support Appellant's argument that he was acting under a cocaine-induced toxic psychosis at the time of the killing, and, therefore, he was unable to form the specific intent to kill the victim. Appellant admitted his guilt to third degree murder of the victim, and urged that this cocaine-induced psychosis evidence would allow the jury to mitigate the charge of first degree murder to third degree murder on the basis of section 308 of the Crimes Code, 18 Pa.C.S. § 308.[9] When the defense proceeded with its case-in-chief, however, Dr. Woody was not present; thus, the defense called Dr. Berman to the stand.

Dr. Berman testified as to the effects of cocaine ingestion on an individual and as to how the ingestion of cocaine would prevent an individual from forming the specific intent to kill. Dr. Berman testified that toxic psychosis, a condition that occurs due to cocaine intoxication, is a recognized psychiatric

9. Section 308 of the Crimes Code, 18 Pa.C.S. § 308, provides:
 Neither voluntary intoxication nor voluntary drugged condition is a defense to a criminal charge, nor may evidence of such conditions be introduced to negative the element of intent of the offense, except that evidence of such intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder.

disorder in the Diagnostic and Statistical Manual, 4th Edition (DSM–4), which is relied upon by psychiatrists in diagnosing patients. Dr. Berman testified that toxic psychosis from cocaine intoxication can occur in individuals at varying dosage levels and cause hallucinations and delusions. Dr. Berman reviewed the autopsy reports and chemical analyses which were performed on the victim and interviewed Appellant. Dr. Berman opined that Appellant was suffering from a cocaine-induced psychotic disorder at the time that he strangled the victim to death. It was Dr. Berman's expert medical opinion that Appellant was unable to form the specific intent to kill the victim. On cross-examination by the prosecution, Dr. Berman explained that his opinion was based on his review of the autopsy reports performed on the victim, as well as his interview of Appellant, Appellant's statement, and the Affidavit of Probable Cause. Moreover, on cross-examination Dr. Berman testified that although he had no knowledge of the amount of cocaine Appellant ingested, the effect of a cocaine-induced psychotic experience is not determined by the amount of cocaine ingested by an individual but by an individual's usage of the drug over a period of time and the manner in which it is ingested. Additionally, on cross-examination, Dr. Berman explained how, from the psychiatric standpoint, Appellant could have been aware that he was physically strangling the victim yet unable to "turn off" his psychosis. Dr. Berman testified on cross-examination that Appellant's ability to physically carry out his plans at the time of the killing did not affect his psychiatric opinion that Appellant was suffering from toxic psychosis.

Dr. Woody was not present in the courtroom at the completion of Dr. Berman's testimony. The defense informed the trial court that Dr. Woody would be "tied up in Center City Philadelphia" until after 5:00 p.m., and would come directly to the courtroom in Media. The defense requested that Dr. Woody be permitted to testify in the defense's case-in-chief, offering Dr. Woody as the author of the section in the DSM–4 dealing with cocaine and psychotic disorders, and as a psychiatrist and an expert in the effect of controlled substances, i.e.,

cocaine, on an individual's brain. The prosecution objected that Dr. Woody's proffered testimony would be cumulative of Dr. Berman's testimony concerning the DSM–4 and the effects of cocaine on Appellant. The trial judge sustained the prosecution's objection, and the defense reluctantly rested its case.

The trial judge then directed the Commonwealth to proceed with its rebuttal witness, Dr. Richard Cohn, who was qualified as an expert in the areas of forensic toxicology and pharmacology. Dr. Cohn testified that cocaine-induced psychosis is dosage dependent, in that the amount of cocaine ingested by an individual and entering the individual's blood stream is an important consideration as to whether a toxic psychosis would be produced. Dr. Cohn further testified that with a chronic cocaine user, it would take a higher dosage for him to be able to opine that the level would be consistent with a toxic psychosis. Dr. Cohn testified that, in view of the levels of cocaine and cocaine metabolites found in the victim's blood and urine, and, assuming that Appellant had consumed the same amount of cocaine as had the victim, it was impossible to conclude that Appellant had suffered a cocaine-induced toxic psychosis at the time of the killing. Additionally, Dr. Cohn opined that Appellant was not suffering from toxic psychosis at the time of the killing because he retained his physical abilities and recalled the events surrounding the killing with clarity. Dr. Cohn further opined that Appellant's specific intent to kill the victim was not affected by his ingestion of cocaine. Dr. Cohn testified on cross-examination that he was not familiar with the DSM–4, mainly because he is not a psychiatrist.

At the conclusion of Dr. Cohn's testimony, Dr. Woody was present in the courtroom, and the defense requested permission to reopen its case-in-chief to call Dr. Woody as on direct examination as part of the defense's case-in-chief. The defense's offer of proof for Dr. Woody's testimony on direct was that he would testify as to the state of scientific literature, with regard to the correlation of dosage of cocaine with psychotic behavior, and the diagnostic criteria for individuals

suffering from the psychotic effects of cocaine. The prosecution objected on the ground that Dr. Woody's testimony as to the psychiatric effect of cocaine ingestion would be cumulative to Dr. Berman's testimony. The trial court sustained the prosecution's objection.

The defense also sought to offer Dr. Woody to rebut Dr. Cohn's testimony regarding the correlation between the dosage amount and toxic psychosis and to give psychiatric opinions as to the effects of cocaine on the human body. The Commonwealth objected on the basis that Dr. Berman had already given expert psychiatric testimony regarding the effects of cocaine on the body, and that the defense was not offering appropriate surrebuttal for toxicology testimony. The trial judge upheld the Commonwealth's objections.

Appellant argues that the trial court erred when it refused to allow the defense to reopen its case-in-chief to present Dr. Woody's testimony. While Appellant concedes that the proffered testimony of Dr. Woody would have overlapped with the testimony presented by Dr. Berman, Appellant contends that the defense had differing intents behind offering the two psychiatrists' testimony: Dr. Woody's testimony was designed to acquaint the jury with toxic psychosis in general, and Dr. Berman's testimony then would have given the jury an understanding of how Appellant had succumbed to this psychosis.

It is within the trial court's discretion to allow either side to reopen its case, prior to judgment, to prevent a failure or miscarriage of justice. *Commonwealth v. Flood,* 426 Pa.Super. 555, 627 A.2d 1193 (1993). The admissibility of evidence is a matter solely within the discretion of the trial court. This court will reverse an evidentiary ruling only when a clear abuse of discretion has occurred. *Commonwealth v. Johnson,* 536 Pa. 153, 638 A.2d 940 (1994); *Commonwealth v. Foy,* 531 Pa. 322, 612 A.2d 1349 (1992); *Laubach v. Haigh,* 433 Pa. 487, 252 A.2d 682 (1969). The trial court may exclude evidence which is merely cumulative of other evidence. *Burch v. Sears, Roebuck and Company,* 320 Pa.Super. 444, 467 A.2d 615 (1983).

Although the testimony of the psychiatric experts did not come into the case in the manner in which the defense had planned, we cannot rule that the trial court committed a clear abuse of discretion in refusing to allow the defense to reopen its case to permit Dr. Woody to testify on direct. As Dr. Berman was offered by the defense to testify in Dr. Woody's absence, Dr. Berman covered in his testimony the information which, apparently, the defense had planned for Dr. Woody to cover. Once Dr. Woody was present in the courtroom, after the defense had rested its case, there was nothing in the defense's offer of proof for Dr. Woody's testimony which would have shown his proffered testimony would not be merely cumulative of Dr. Berman's testimony regarding the effects of cocaine ingestion on an individual's brain. We thus find no clear abuse of discretion on the part of the trial court in refusing to permit the defense to reopen its case-in-chief so that Dr. Woody could be called on direct.[10]

**10.** Our esteemed colleagues in the dissent conclude that Dr. Woody's testimony should have been allowed under the defense's offer of proof that Dr. Woody would testify as to the state of the scientific literature on toxic psychosis. They believe that Dr. Woody's testimony would have refuted Dr. Cohn's testimony, specifically his opinion relating to the relationship between dosage and toxic psychosis, and the ramifications of Appellant's ability to recall his physical and mental activity at the time of the killing with regard to whether he was suffering from toxic psychosis. The dissent stresses that Dr. Cohn was a toxicologist, and not a psychiatrist, such that the jury needed to hear testimony from a psychiatrist, Dr. Woody, to rebut the psychiatric aspects of Dr. Cohn's opinion. Moreover, the dissent points to a question from the jury, regarding whether Dr. Cohn testified that he believed that Appellant could have possibly suffered a toxic psychosis at the time of the killing, as indicating the jury's need to have surrebuttal testimony from Dr. Woody on these points.

We respectfully cannot agree with the dissenting opinion. It overlooks the facts that Dr. Berman testified on cross-examination that the scientific literature does not agree upon or determine a specific amount of cocaine which would be adequate to produce a toxic psychosis, and that there are no studies on which he, as a psychiatric expert, could render a judgment on how much cocaine would be required to induce a toxic psychosis. Dr. Berman's testimony on cross-examination also was clear that as a psychiatrist, his opinion that Appellant suffered from a toxic psychosis at the time of the killing was not affected by Appellant's ability to recall with clarity his physical and mental activities at the time of the killing, because he believed Appellant would have been

 Nor can we conclude that the trial court erred in refusing to allow Dr. Woody to testify on surrebuttal of Dr. Cohn's toxicological testimony. A party may produce evidence to rebut testimony which he or she has elicited from an opponent's witness on cross-examination. *Commonwealth v. Smith,* 490 Pa. 380, 416 A.2d 986 (1980); *Commonwealth v. Hickman,* 453 Pa. 427, 309 A.2d 564 (1973). Admission of rebuttal evidence is a matter within the sound discretion of the trial court. *Commonwealth v. Miller,* 490 Pa. 457, 417 A.2d 128 (1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981).

The offer for Dr. Woody's surrebuttal testimony which Appellant made at trial did not go to testimony which was brought out upon the defense's cross-examination of the prosecution's witness, Dr. Cohn. Dr. Cohn was unable to testify on cross-examination about the DSM–4, as he is not involved in the psychiatric field; he was familiar with pharmacology literature on toxic psychosis. Dr. Woody's expert psychiatric testimony would have been cumulative to the testimony of Dr. Berman regarding the psychiatric diagnosis of toxic psychosis in an individual. We find no abuse of the trial court's discretion in refusing to allow Dr. Woody to testify on surrebuttal.

 Appellant next argues that the trial judge erred when he deviated from section 8.308B of the Pennsylvania Suggested Standard Jury Instructions in charging the jury with regard to his drug defense. Appellant challenges the trial judge's inclusion, at the Commonwealth's request and over the objection of the defense, of the following language in his

unable to "turn off" his body's response to the effect of the cocaine on his system.

Thus, with all due deference, we cannot agree that "the information which Dr. Woody should have been permitted to present in surrebuttal was crucial to appellant's defense and integral to the concerns of the jury reflected in the questions submitted during deliberations." (Dissenting Opinion, Op. at p. 1097) The record reflects that the jury heard expert psychiatric testimony from Dr. Berman on the issues of whether the scientific literature supports a correlation between cocaine levels and toxic psychosis, and whether Appellant's ability to recall his physical and mental actions was indicative in any way of the presence of toxic psychosis.

instruction: "[t]o negate the intent necessary for conviction of murder in the first degree, a defendant must have been overwhelmed or overpowered by drugs to the point of losing his faculties, so as to be incapable of forming a specific intent." Appellant asserts that this included language, which we have held to be appropriate in matters where alcohol or drug intoxication is alleged, should not have been used in the instant matter, where a drug-induced toxic psychosis was alleged.

When evaluating jury instructions, this court has stated:

[t]he charge must be read as a whole to determine whether it was fair or prejudicial. The trial court has broad discretion in phrasing its instructions, and may choose its wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. *Commonwealth v. Prosdocimo*, 525 Pa. 147, 150, 578 A.2d 1273, 1274 (1990). Furthermore, this Court "will not review a charge to the jury by focusing on one or two words taken out of the context within which they were spoken." *Commonwealth v. Stokes*, 532 Pa. 242, 252, 615 A.2d 704, 709 (1992).

*Commonwealth v. Griffin*, 537 Pa. 447, 460, 644 A.2d 1167, 1173–74 (1994).

Here, the trial court instructed the jury:

[T]he general rule is that a voluntary drug condition is not a defense to a criminal charge. Generally speaking, a person who voluntarily used drugs cannot become so drugged that he or she, for that reason, [is] legally incapable of committing a crime. The general rule is subject to a qualification when the crime charged is first degree murder. The defendant is permitted to claim as a defense that he was so drugged at the time of the killing that he did not possess the specific intent to kill required for first degree murder.

Evidence of a drug condition as negating intent necessary for a conviction of murder in the first degree has been submitted for your consideration. You may believe any, all, or none of the testimony offered at this trial. To negate the

intent necessary for conviction of murder in the first degree, a defendant must have been overwhelmed or overpowered by drugs to the point of losing his faculties, so as to be incapable of forming a specific intent.

Now the Commonwealth has the burden of disproving this defense. That is to say you cannot find the defendant guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the defendant, despite any drug condition, was at the time capable of forming and did, in fact, form a specific intent to kill Eileen Jones; that is, a willful, deliberate, and premeditated design to kill her. Voluntary drug condition may reduce a crime of murder from first degree to third degree; however, voluntary drug condition is never a defense to a charge of third degree murder.

(N.T. 5/18/95, pp. 121–123)

As Appellant recognizes, this court has stated that evidence of intoxication or drug use does not of itself negate otherwise sufficient evidence of specific intent. *Commonwealth v. Wilson,* 543 Pa. 429, 672 A.2d 293 (1996)(citing *Commonwealth v. Stoyko,* 504 Pa. 455, 475 A.2d 714 (1984); *cert. denied,* 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984)). The trial judge's challenged instruction in this matter reflected our decision in *Wilson* regarding a voluntary drug condition. In *Wilson, supra,* the defendant argued that there was insufficient evidence to convict him of first degree murder because of testimony of witnesses that the defendant had spent the evening of the killing smoking cocaine, and, therefore, in his drug intoxicated condition, it was impossible for him to form a specific intent to kill. Citing *Commonwealth v. Edmiston,* 535 Pa. 210, 634 A.2d 1078 (1993), we stated in *Wilson* that, as with a defendant claiming use of alcohol prevented him from forming a specific intent to kill, a defendant claiming use of drugs must also show he was overwhelmed or overpowered by the drugs to the point of losing control over his or her faculties. *See also Commonwealth v. Marshall,* 534 Pa. 488, 633 A.2d 1100 (1993). The defendant in *Wilson* failed to

introduce any evidence that his drug use before the killing in that matter caused him to lose control of his faculties.

Appellant argues that the language included by the trial judge here, regarding a defendant being overwhelmed or overpowered by the drugs to the point of losing control over his faculties, may be appropriate in cases of alcohol intoxication but is inappropriate for a cocaine-induced toxic psychosis because, as Dr. Berman testified, such a psychosis impairs an individual's ability to think rationally but is not physically manifested in the same manner as an individual appearing drunk. Appellant does not suggest how the charge we have approved for drug intoxication is insufficient, and utterly fails to show what different analysis should be employed, in a matter where a drug-induced psychosis is alleged. The jury heard Dr. Berman's testimony regarding the effects of his alleged cocaine-induced psychosis, and the instructions as given here provided the jury with the proper means of analyzing that testimony and then determining if the evidence was sufficient to reduce Appellant's culpability in this case from first to third degree murder.

The trial judge's jury charge was appropriate, given the fact that the jury had heard Dr. Berman's theory. We therefore find no abuse of the trial judge's discretion in including the language challenged by Appellant in his jury instruction.[11]

■ Finally, Appellant contends that the trial court erred when it overruled Appellant's objection to the manner of assembling the jury pool. Prior to trial, Appellant asserted, in a motion challenging the assembling of the jury pool in his case, that the manner of assembling jury panels in Delaware

---

11. Appellant seems to assert by implication that the Pennsylvania Suggested Standard Jury Instructions contain the verbiage required for a proper jury charge. Once again, we emphasize that this court has never adopted the Pennsylvania Suggested Standard Jury Instructions, which exist only as a reference material available to assist the trial judge and trial counsel in preparing a proper charge. Accordingly, strict adherence or non-adherence to any of the suggested charges is not necessarily dispositive of the issue of whether the jury charge is legal and proper. *See, e.g., Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575 (1991).

County was constitutionally infirm in that the resulting pools failed to reflect a fair and representative cross-section of African–Americans in the community. At a hearing on this motion before the trial judge, Appellant introduced the record from two other capital cases, *Commonwealth v. Gease,* (Delaware County Common Pleas Court Criminal Division No. 94–902), and *Commonwealth v. Craver,* (Delaware County Common Pleas Court Criminal Division No. 93–1902),[12] in which arguments alleging that underrepresentation of African–Americans results from Delaware County's jury selection system were raised. The trial court denied Appellant's motion.

Appellant challenges this ruling, arguing that the procedure used by Delaware County to assemble its jury pools is constitutionally infirm, in that the resultant panels are not a fair cross section of the community at large, and, accordingly, that his rights under the Sixth Amendment of the United States Constitution have been violated. We recently explained in our opinion in *Commonwealth v. Craver:*

> In order to establish a prima facie violation of the requirement that the jury array fairly represent the community, a defendant must show that: (1) the group allegedly excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such people in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) "Systematic" means caused by or inherent in the system by which juries were selected. *Id.* at 366–67, 99 S.Ct. at [669–70] 58 L.Ed.2d at 588.

*Craver,* 547 Pa. 17, 688 A.2d 691, 696 (1997).

Appellant asserts that the first prong of *Duren* is satisfied here because the African–American population of Delaware

**12.** This court's decision regarding the defendant's appeal of his judgment of sentence of death in *Commonwealth v. Craver,* No. 98 Capital Appeal Docket, was issued by this court on January 14, 1997. A direct appeal in *Commonwealth v. Gease,* No. 116 Capital Appeal Docket, which does not raise any issue regarding the jury selection process in Delaware County, is currently pending before this court.

County is a distinctive and significant portion of the County's populace. As to the second prong of *Duren*, Appellant relies upon an informal survey conducted by the Public Defender's Office between August of 1994 and January of 1995 and upon testimony by Dr. John Lamberth,[13] who testified in the *Gease* matter as an expert in jury selection or composition. Dr. Lamberth's testimony in *Gease* was based upon the results of a survey conducted by the Public Defender's Office between August 15, 1994 and September 27, 1994. Dr. Lamberth's testimony in *Gease* was that these survey results show that the average number of African–Americans in the jury pool in Delaware County is well below the percentage of African–Americans in the population of Delaware County at large. Moreover, as to the third prong of *Duren*, Appellant points to testimony by Dr. Lamberth that Delaware County's use of voter registration lists, as supplemented by a list of licensed drivers within Delaware County, to assemble jury pools results in systematic exclusion of African–Americans from the pools. In further support of this argument, Appellant points to Dr. Lamberth's testimony that there is a low response rate to jury summonses in Delaware County, with no effort by Delaware County to follow-up on failures to respond to summonses.

In *Craver*, we rejected the argument by the appellant therein that the jury venire summoning procedures in Delaware County systematically produce panels of prospective jurors on which African–Americans are underrepresented. The appellant in *Craver* based his attack on Delaware County's jury selection procedure upon an informal survey conducted by employees of the Delaware County Public Defender, as well as upon expert testimony of Dr. Lamberth. Dr. Lamberth testified in *Craver* that the summoning procedures used in Delaware County result in significant underrepresentation of African–Americans. Dr. Lamberth based his conclusion, in part, on the Public Defender's informal survey.

13. Dr. Lamberth, a social psychologist who compiles statistical data on jury compositions, was retained by the Delaware County Public Defender to review the jury selection procedures in Delaware County.

We agreed with the trial court in *Craver* that the Public Defender's informal study was inherently flawed and was entitled to little weight. We further agreed in *Craver* with the trial court's rejection of Dr. Lamberth's expert testimony for a number of reasons, including Dr. Lamberth's reliance for his opinion on this flawed Public Defender's informal survey and his reliance on inaccurate and irrelevant statistics. We thus held in *Craver* that the appellant therein failed to show that the representation of African–Americans in Delaware County jury arrays is not fair and reasonable.

Additionally, the appellant in *Craver* argued that the under-representation of African–Americans in the jury array he alleged was due to the systematic exclusion of that group by Delaware County's jury selection process, which employs voter registration lists and lists of licensed drivers. Addressing this argument, we explained in *Craver:*

> It is well settled that "a criminal defendant may not attack the racial composition of jury panels drawn from voter registration lists on the theory that blacks are underrepresented in voter lists." *Commonwealth v. Henry,* 524 Pa. 135, 144–45, 569 A.2d 929, 933 (1990) (citations omitted). In *Commonwealth v. Jones,* 465 Pa. 473, 350 A.2d 862 (1976), this court upheld Delaware County's method of using voter registration lists to create its jury array. Since that time, the county's jury pool has been made more inclusive by adding to the pool lists of those holding driver's licenses, as permitted by 42 Pa.C.S. § 4521. The United States Supreme Court likewise requires a showing of actual discriminatory practice to prevail on this issue. "Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels or venires from which juries are drawn must not *systematically* exclude distinctive groups in the community and thereby fail to be *reasonably* representative thereof." *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690, 703 (1975) (citations omitted; emphasis added).

*Craver,* 688 A.2d at 696. In *Craver,* we held that the jury array was summoned by Delaware County in a manner consis-

tently held by this court to be fair and constitutional, and the appellant therein had failed to prove any discriminatory practices.

As in *Craver*, the informal study by the Public Defender's Office and Dr. Lamberth's expert testimony based on the Public Defender's data were appropriately accorded little weight by the trial court in the instant matter. We hold that the trial judge in the present case properly concluded that Appellant did not establish that African–Americans are under-represented in the jury pools in Delaware County. Moreover, Appellant's attack on the selection process employed by Delaware County goes to the use of voter registration lists and lists of licensed drivers, which we found to be fair and constitutional in *Craver*. We likewise agree with the trial court that there is no evidence in the record to suggest that a disproportionate number of African–American potential jurors fail to respond to the jury summonses. The trial court, thus, properly concluded that Appellant failed to establish any systematic exclusion of African–Americans in the jury selection process.

Pursuant to 42 Pa.C.S § 9711(h)(3), we have the duty to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

■■■ Upon conducting this review, we find that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. Evidence was presented at the sentencing hearing, in the form of a stipulated Commonwealth Exhibit, that Appellant had previously been convicted of voluntary manslaughter. This evidence was sufficient to estab-

lish the aggravating circumstance found by the jury. 42 Pa.C.S. § 9711(d)(12).

Additionally, we have reviewed the sentencing data compiled by the Administrative Office of the Pennsylvania Courts in accordance with the requirements of *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), and have performed an independent review of the cases involving the sentence of death to determine whether Appellant's sentence of death was proportional to the sentences imposed in similar cases, taking into consideration both the circumstances of the offense and character and record of Appellant. After conducting this review in the present appeal, we find the sentence imposed upon Appellant to be not excessive or disproportionate to the sentence imposed upon defendants in similar cases.

Accordingly, we affirm the conviction and judgment of sentence imposed upon Appellant, Wayne A. Smith, by the Court of Common Pleas of Delaware County.

Judgment of sentence affirmed.[14]

FLAHERTY, C.J., files a dissenting opinion in which ZAPPALA, J., joins.

FLAHERTY, Chief Justice, dissenting.

I dissent. I believe it was reversible error to exclude the testimony of Dr. George Woody, appellant's psychiatric expert surrebuttal witness. The proffered testimony, while it would have overlapped other testimony, was not merely cumulative of other evidence. Furthermore, we cannot assume that the excluded testimony, if Dr. Woody had presented it to the jury, would not have led to a different verdict. Thus, I would reverse and remand for a new trial pursuant to 42 Pa.C.S. § 9711(h)(3)(i).

Dr. Berman, a psychiatrist, testified during the defense case-in-chief, expressing his opinion that appellant suffered

14. The Prothonotary of the Supreme Court is directed to transmit, within ninety (90) days, the full and complete record of the case *sub judice* to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).

from toxic psychosis at the time of the crime, preventing him from forming a specific intent to kill. He also testified that toxic psychosis was not dosage-related.

In rebuttal, the prosecution presented Dr. Richard Cohn, an expert in the areas of forensic toxicology and pharmacology but not a medical doctor. Dr. Cohn stated, contrary to Dr. Berman, that toxic psychosis was in fact dosage-related, that chronic drug abuse would create a tolerance to the psychosis, and that, in Dr. Cohn's opinion, appellant was not acting under a toxic psychosis at the time of the murder. The latter opinion was based partly on Dr. Cohn's observation that appellant appeared to be quite capable in his physical and mental capabilities around the time of the crime.

The defense then proffered the testimony of Dr. Woody, another psychiatrist, in surrebuttal, representing: "[T]he testimony that Dr. Woody will be presenting is almost, if not, entirely in response to testimony presented by Dr. [Cohn] in Commonwealth's rebuttal. So I think it is proper surrebuttal. He'll be commenting on Dr. [Cohn's] account of the state of scientific knowledge." N.T., 5/18/95, at 6.

I believe it was erroneous to reject Dr. Woody's testimony when it was offered to rebut the testimony of Dr. Cohn. Dr. Cohn was not a psychiatrist but a forensic toxicologist. His expertise was in relating quantitative dosages of drugs and alcohol to their effects on the human body. Dr. Woody's testimony would have directly refuted Dr. Cohn's contention that a correlation exists between cocaine levels and toxic psychosis. Dr. Woody would also have testified that the psychotic disorder induced by cocaine would not manifest itself in any physical manner. This would have been a direct contradiction of Dr. Cohn's statement that appellant's lack of physical impairment was a basis for concluding that he did not suffer from toxic psychosis. Thus Dr. Woody, appellant's psychiatric expert, would have testified that the testimony of Dr. Cohn, the Commonwealth's expert, was arguably incorrect in terms of the state of scientific knowledge in the field.

It would have been proper surrebuttal to present the testimony of Dr. Woody in contradiction of Dr. Cohn's testimony. *See Commonwealth v. Ragan*, 538 Pa. 2, 21, 645 A.2d 811, 820 (1994); *Hoffman v. Berwind–White Coal Mining Co.*, 265 Pa. 476, 485, 109 A. 234, 238 (1920); *Remy v. Michael D's Carpet Outlets*, 391 Pa.Super. 436, 443–44, 571 A.2d 446, 450 (1990).

The core issue during the guilt phase of the trial was whether appellant had formed the specific intent to murder the victim. The proffered testimony of Dr. Woody had a direct bearing on that issue. The significance of the issue was manifested by a question sent out by the jury during its deliberations: "Did Dr. Cohn say a toxic psychosis could have been possible in Wayne Smith's case?" The question struck directly to the heart of the issue of appellant's level of culpability in the murder. In this trial there was no dispute that toxic psychosis would negate the ability to form a specific intent to kill; the only debate was whether or not appellant was suffering toxic psychosis at the time of the killing. The information which Dr. Woody should have been permitted to present in surrebuttal was crucial to appellant's defense and integral to the concerns of the jury reflected in the question submitted during deliberations.

I therefore conclude that the trial court committed reversible error when it refused to permit Dr. Woody to testify in surrebuttal during the guilt phase of appellant's trial. I would reverse the judgment of sentence and remand for a new trial.

ZAPPALA, J., joins this dissenting opinion.